**Henry J. HAND, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 1095.**

United States District Court
M. D. Georgia,
Columbus Division.

Aug. 3. 1966.

Vincent P. McCauley, Columbus, Ga., for plaintiff.

Floyd M. Buford, U. S. Atty., and Arnold C. Young, Asst. U. S. Atty.. Macon, Ga., for defendant.

ELLIOTT, District Judge:

This is an action brought under the Federal Tort Claims Act, Sections 2671–2680, Title 28, United States Code. This Court has jurisdiction under §§ 1346(b) and 1402(a)(b), Title 28, United States Code. The Plaintiff sues for damages incident to personal injuries claimed to have been sustained by him by reason of the alleged negligent operation of a motor vehicle by an agent of the United States of America, the agent being a member of the United States Army who was at the time of the incident complained of stationed at Fort Benning in the state of Georgia. This opinion is intended as compliance by the Court with the requirements of Rule 52, Federal Rules of Civil Procedure.

On the morning of December 11, 1964 the Plaintiff, who was and is a resident of the City of Columbus, Georgia, left his home in Columbus in the company of a friend for the purpose of going on a bird hunt in an area located in Stewart County, Georgia some forty miles distant from Columbus, he and his companion traveling in a civilian vehicle which was being driven by the companion. The direct route which would normally be followed by anyone traveling from Columbus to Stewart County would be south on U. S. Highway No. 27, which highway traverses a portion of the United States military reservation known as Fort Benning. This was the route followed by Hand and his companion. After they had traveled a few miles and were on the section of the highway which traverses the military reservation a collision occurred between the vehicle in which the Plaintiff was a passenger and an Army Jeep which was at that time being operated by Pfc. Emmett L. Smith, a member of the United States Army acting within the scope of his duties, the collision causing the Plaintiff to be thrown from the vehicle in which he was a passenger, he thereby sustaining serious, painful and permanent injury.

At the point where the collision occurred U. S. Highway 27 runs generally east and west and consists of four lanes, two of the lanes being designated for eastbound traffic and two lanes for westbound traffic, the adverse lanes being separated by a median strip several feet in width. A side road known as Wyatt Street forms an intersection with and crosses U. S. Highway 27 at this point. U. S. Highway 27 is officially designated as a "through" highway and stop signs are posted for all traffic entering upon or crossing the highway from Wyatt Street, all traffic on U. S. Highway 27 moving east and west having the right of way over traffic crossing the highway from Wyatt Street.

As the vehicles involved approached this intersection the civilian vehicle was proceeding in an easterly direction on U. S. Highway 27 and the military vehicle was proceeding in a southerly direction on Wyatt Street. Pfc. Smith brought the military Jeep to a stop before crossing the lanes provided for westbound traffic and again brought his vehicle to a stop in the median strip preparatory to crossing the lanes provided for eastbound traffic. He was thoroughly familiar with this intersection and knew that traffic was heavy on the highway and that in general it was a dangerous intersection. He observed the civilian vehicle approaching from the west and knew that it had the right of way. Nevertheless, he attempted to "beat" the other vehicle across the intersection by accelerating the Army Jeep, thinking that he would be able to clear the intersection without collision. He was wrong. Although the civilian vehicle was traveling at a speed of only approximately thirty miles per hour it was practically upon him when he went across the intersection, and although the driver of the civilian vehicle turned sharply to the left in an attempt to avoid the collision he was unable to do so. In consequence, the collision occurred.[1]

1. The Court notes that during the course of his testimony Pfc. Smith gives two versions of the incident. At one point during his testimony he stated that he did not see the civilian vehicle approaching and gives that as the reason he entered

The applicable law of the State of Georgia is as follows:

"*68–1652. Same; vehicle entering through highway or stop intersection.* —(a) The driver of a vehicle shall stop as required by this law [Chapters 68–15 through 68–17; §§ 68–9926, 68–9927] at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard, but said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection on said through highway shall yield the right of way to the vehicle so proceeding into or across the through highway.

"(b) The driver of a vehicle shall likewise stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously, yielding to vehicles not so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

Ga.Code Anno., § 68–1652.

■ The Court finds as a matter of fact that the civilian vehicle in which the Plaintiff was a passenger was being operated in an entirely proper manner and that there was nothing which the occupants of the civilian vehicle could have done in the circumstances to have avoided the collision, and that the sole proximate cause of the collision and of the injuries sustained by the Plaintiff was the negligence of Pfc. Smith in failing to yield the right of way to the civilian vehicle and in entering the

intersection when the civilian vehicle was approaching so closely as to constitute an immediate and obvious hazard, all in violation of the Georgia statute above quoted.

In the answer filed by the Defendant it was denied that there was any negligence on the part of Pfc. Smith, but all of the evidence was contrary to this defense, and it is noted by the Court that in the post-trial brief filed by counsel for the Defendant there is no argument made in support of this defense. The only defense seriously urged is the contention by the Defendant that since the Plaintiff is himself a member of the armed forces the injuries sustained by him would be "in the course of an activity incident to his military service in the United States Army", and in consequence would not be compensable under the Tort Claims Act. The Defendant by this contention seeks to bring the case within the ambit of the decision of the Supreme Court of the United States in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The Plaintiff, on the other hand, insists that this defense is unavailing because while it is true that he is a member of the armed forces the circumstances of this case distinguish it from the facts which formed the basis for the *Feres* decision and make this case compensable under the decision of the Supreme Court of the United States in Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L. Ed. 1200 (1949).

These contentions make it necessary for us to examine the circumstances having to do with the status of the Plaintiff in the case before us at the time these injuries were sustained in order that it may be determined whether a quail hunt is "an activity incident to his military service in the United States Army".

---

the intersection. At another point he gives the version which the Court has adopted, the Court believing this version to be more likely since the evidence shows that the road was straight and level for a considerable distance and that there was no obstruction whatever to prevent Pfc. Smith seeing the approaching civilian vehicle.

The evidence shows that at the time of the collision above described the Plaintiff was, and had been for a number of years, a member of the United States Army. He was assigned to duty at Fort Benning. He was on duty at Fort Benning on December 10, 1964, the day before this incident occurred. At the end of the duty day on December 10 he had obtained a twenty-four hour pass, relieving him from duty on December 11, 1964. Having no military duties to perform on that date and having a twenty-four hour pass he decided to go on a bird hunt as heretofore indicated. The bird hunt was not to take place on the military reservation. It was to take place in Stewart County, Georgia on civilian property. He was not ordered to go on the bird hunt. He was not performing any military mission. He was not discharging any military duty. It was a thing which he was doing for recreation and solely for his personal pleasure. He was not going to the hunt in a military vehicle and the Army had no connection with the trip in any way.

Do these facts resemble the facts in the *Feres* case relied upon by the Government or do they resemble the facts of the *Brooks* case relied upon by the Plaintiff?

In the *Feres* case the decedent, a member of the armed forces, perished by fire in the barracks at an Army camp while he was on active duty. He was not on leave of any kind and he was sleeping in the barracks provided for him on the post by the military authorities. Negligence was alleged in quartering him in barracks known or which should have been known to be unsafe because of a defective heating plant and in failing to maintain an adequate fire watch. The Supreme Court held that since sleeping in the barracks was incident to his military service the claim was not compensable under the Tort Claims Act.

In the *Brooks* case Brooks was a member of the military forces, but he was on furlough driving along the highway under no orders and on no military mission. A Government owned and operated vehicle collided with him. The Government contended that there could be no liability for his injuries because he was in the Army. The Supreme Court rejected this contention because Brooks' relationship while on leave was not analogous to that of a soldier injured while performing duties on orders.

It is obvious that there is a marked similarity between the facts of this case and the facts of the *Brooks* case above cited. Indeed, if the word "furlough" in the *Brooks* case were changed to "pass" there would be no difference. In the *Brooks* case and in this case the man was a member of the Army. In the *Brooks* case and in this case the man was relieved from all military duties for a specified period of time, and was allowed to do whatever he pleased in the interim. In the *Brooks* case and in this case the man was on a purely personal mission. In the *Brooks* case and in this case the man was under no compulsion of any military orders. In the *Brooks* case and in this case the man was not using Government equipment for any purpose. In the Army the only difference between a "furlough" and a "pass" is that a furlough is for a longer period of time and is charged against a man's record, while a pass is for a shorter period of time and is not charged against a man's record. There is no difference in the freedom which the man enjoys. In both instances the man is relieved from military duty during the period specified. Of course, all members of the armed forces are subject to immediate recall by their commanding officers regardless of whether they are on pass, furlough, leave or whatever the temporary relief from duty may be called. We, therefore, attach no significance to the fact that in the *Brooks* case the man was on what is known as "furlough" and in this case the Plaintiff was on what is known as a "pass", and conclude that the fact that the man was on a pass instead of a furlough would not tend to make a quail

hunt "an activity incident to [his] military service".

In this case the Defendant also suggests that since this collision occurred on the portion of U. S. Highway 27 which traverses the Fort Benning military reservation that it actually happened "on the reservation" and that that fact should distinguish this case from the *Brooks* case. Here again let us examine the circumstances. As heretofore noted, U. S. Highway 27 traverses a portion of the Fort Benning military reservation. The history of this situation is that in 1941 the United States gave the State of Georgia a license to enter upon the federal reservation for the purpose of constructing this highway and gave the State a right of way for such highway use, and in connection with this arrangement the United States agreed not to unnecessarily interfere with the use and enjoyment of the State of Georgia of said right of way for highway purposes. The State of Georgia constructed the highway and the highway is maintained by the State. However, police jurisdiction over the highway is retained by the United States since it passes through the reservation. The highway has been from the time of its construction and is now open to use by all members of the public without restraint or interference by the Commanding General at Fort Benning. While the Commanding General has the jurisdiction to prohibit use of other roads on the military reservation and does from time to time prohibit such use he has no such jurisdiction over that portion of U. S. Highway 27 which lies within the reservation. In other words, the only thing that enables the Defendant in this case to say that this incident complained of occurred "on the reservation" is the fact that this particular portion of this highway lies within the physical boundaries of the reservation, but it is not a "military road" as are all other roads on the reservation. Even though the portion of the highway where this incident occurred is technically within the military reservation, we do not consider this fact to be of any materiality because the question is not *where* the Plaintiff was at the time of injury, but the question is whether what the man was doing at the time of injury was in the course of activity incident to his military service.

In Rich v. United States, D.C., 144 F.Supp. 791 (1956) the District Court for the Eastern District of Pennsylvania had before it for consideration the same questions with which we deal in this case, and there the Court said:

" * * * the determinative fact in each case is not where the plaintiff was at the time he was injured (whether on or off the military reservation) and not whether he was at the time on pass, furlough, or 'leave' (although these things may have a bearing on the ultimate question), but whether what he was doing at the time was, in the language of the Feres case, 'in the course of activity incident to service.' "

■ Having considered the facts of this case as related to the facts in the *Feres* case and the facts in the *Brooks* case, we conclude that recovery may be had by the Plaintiff here under the authority of the *Brooks* decision.

As heretofore noted, when this collision occurred Plaintiff was thrown from the vehicle in which he was a passenger. He struck the concrete pavement of the highway with considerable force and was rendered unconscious for a time. He had numerous contusions and lacerations, but the most serious of his injuries were to his head and his left hand. After regaining consciousness in the hospital he complained of severe frontal headaches and x-rays revealed a lineal skull fracture in the left parietal area directly beneath a laceration on the scalp. The frontal headaches continued and he subsequently showed a rise in blood pressure and reflexes indicative of neurological involvement. He developed a general lack of awareness and had episodes of combativeness to the extent that it was neces-

sary to physically restrain him during some of the more aggressive periods. Because of the general deterioration in his condition he was transferred from Martin Army Hospital at Fort Benning to Walter Reed General Hospital where the conclusion was reached that he had suffered a sub-dural hematoma resulting from brain hemorrhages and intracranial mass lesions. Brain surgery was performed and when a portion of the skull was removed a mass lesion was disclosed in the area of the right temporal lobe of the brain. It was discovered that a portion of this temporal lobe was necrotic and a portion of this lobe of the brain was surgically removed. Subsequently infection developed in the area and it was necessary to make a second entry to relieve this condition. For several weeks following the operation the Plaintiff was quite confused and disoriented, but this condition gradually improved with continued treatment. He was hospitalized for a period of approximately five months. In consideration of the possibility that the brain injury might result in epileptic seizures he has been required to take dilantin at prescribed intervals ever since his release from the hospital, this being a drug used in the treatment of epilepsy. The injury to his left hand resulted from severe lacerations to his middle and ring fingers and he has a permanent limitation of motion in those two fingers which results in some limitation of use of the left hand. The operation which was performed on his brain left a permanent depression in his skull in the area where the operation was performed, and since a portion of the bone was removed this area is more susceptible to injury than previously. Also, since the depressed area is near the point where the jawbone joins the skull he has some pain in this area on movement of the jaw. When he was finally discharged from the hospital he was given a profile of P–3, which is a specific limitation upon his activity as a soldier.

On the date this incident occurred the Plaintiff was a Sergeant Major in the Army with twenty-one years of service. His duty assignment for several years prior thereto had been as Sergeant Major of the United States Army Marksmanship Training Unit at Fort Benning. In that position he had been a highly competent, efficient and well-liked soldier. Several officers who had worked with him testified that he had always been an excellent Sergeant Major. One testified that he was the best Sergeant Major he had ever known.

Following his release from Walter Reed Hospital in May, 1965 he was allowed to resume his duty assignment at the Marksmanship Training Unit at Fort Benning, but he showed a marked change in personality as manifested by a steady decrease in his efficiency and in his ability to get along with others. He was noticeably forgetful and evasive. He was uncooperative and combative in his attitude with his associates and superiors. He was irritable and anti-social. He was sarcastic and complaining. He is quick to become angry and easily upset. His speech has become hesitant and at times heavy and incoherent and he frequently repeats himself. He gives his superiors and others associated with him the impression of instability. He is short-tempered and abrupt with his associates. All of these characteristics mentioned were foreign to his personality prior to sustaining the brain injury, and these changes are obviously the result of that injury. Perhaps the best assessment of the deterioration of the Plaintiff's performance and mental capabilities was expressed by Col. Peot who until recently was the Plaintiff's commanding officer, who says with regard to the Plaintiff:

"During the period of observation, since his return from Walter Reed, there has been a gradual deterioration of his overall performance. His performance has been closely observed by his superiors for the past year. Although he has continued to maintain a

fine personal appearance and military bearing, his speech has become hesitant, at times heavy and incoherent, and considerable forgetfulness has been detected. He has become quite evasive at times and gives some indication of instability to the extent that a fair evaluation of his performance cannot be made. Based on these personal observations and comments of close associates it is believed that the injury received by SMAG Hand has had a deleterious effect. It would appear to be a dis-service to assign this NCO to a position of responsibility without benefit of a thorough physical evaluation."

In view of the evidence of change in personality and the general reduction in this man's capabilities resulting from his injuries it is not surprising that the evidence showed that in March, 1966 the Plaintiff was relieved of his assignment as Sergeant Major of the Army Marksmanship Training Unit, the post which he had held for five years.

Prior to sustaining his injuries Sgt. Hand participated in many activities which he has now found it necessary to either eliminate or curtail. He has always been an avid hunter and fisherman and he now finds it necessary to curtail these activities substantially. He has an understandable fear of again hurting himself in the vulnerable skull area and he also harbors the constant thought of possible convulsive seizures in the event of over-exertion or other unusual physical disturbance. Stated otherwise, he has been partially deprived of his capacity to enjoy life as he was able to enjoy it prior to his injuries. He has lost the satisfaction of being able to do his job well, he has lost the trust, friendship and confidence of his companions, associates and superiors, and he has lost his ability to engage in sport and recreation which was a previous source of personal satisfaction to him, and it is obvious that his situation is not improving. All of these things are an element of pain and suffering.

Sgt. Hand endured severe physical pain and suffering for several months following the date of his injuries. He now suffers to a lesser degree, but he will continue to have pain and discomfort for the remainder of his life. He will also have a diminished earning capacity.

█ The pain and suffering which he has undergone, now has, and will have in the future, without regard to loss of earning capacity, entitles him to be compensated in an amount of $15,000.00.

█ We now consider his diminished earning capacity. We do not find it difficult to predict with what we consider to be a degree of reasonable certainty the financial loss which Sgt. Hand is going to sustain as a result of his injuries. At the time this incident occurred he was forty years of age and in perfect health and had a life expectancy of approximately thirty years. He has had an outstanding career in the Army and had risen to the highest rank attainable by an enlisted man. He was what might be regarded as the ideal soldier. It could have been reasonably expected that he would have remained in the Army until reaching the mandatory retirement age of sixty-five because Sergeant Majors do not usually retire until required to do so. We are dealing with a man here who had an intense interest in the Army and who was liked in turn by the Army. The compensation which he has been earning as a Sergeant Major amounted to approximately $6,000.00 per year. This means that normally between age forty and age sixty-five he would have earned $150,-000.00. At age sixty-five he would have been required to retire on 75% of his base pay and for the next five years he would have received retirement pay in the amount of $22,500.00, making a total compensation which he could have expected to receive until the end of his life expectancy of an amount of $172,500.-00. True, he has thus far been retained in the Army and has suffered no loss of pay, but his usefulness to the Army is

negligible and we consider it reasonable to presume that he will soon be required to accept retirement. The statement of his commanding officer heretofore quoted strongly indicates that probability and the anticipated development is further suggested by the fact that he has been relieved of duties in the area of his chief usefulness. It may be that he will be retained for another year or so before being required to retire and for the purposes of this summary we will presume that he will be retained until he has completed twenty-five years, which would mean that he will be retained for about two years longer. If he is required to retire after completing twenty-five years, as we anticipate, he will have sustained no loss in earnings until about age forty-five. If he is required to retire upon the completion of twenty-five years service, he will not retire on 75% of base pay, but will retire on 62½% of base pay, and this will continue to be his compensation for the remainder of his life. If this situation develops it will mean that from the time he sustained his injuries until age seventy, the presumptive age of death, he will have received $123,750.00. The difference between this figure and $172,-500.00, which is the amount he would normally have been expected to have been able to earn but for his injury, is $48,750.00, and that is what we determine to be his loss of earning capacity as a result of his injuries. The present cash value of this loss is approximately $26,-000.00 and he should be compensated for lost earning capacity in that amount.

The total of the above items is $41,000.00.

Sgt. Hand's case was actively litigated and competently handled by his counsel and we determine that his counsel is entitled to be awarded as reasonable attorneys fees the full 20% of the award permissible under § 2678, Title 28, United States Code. This amounts to $8,200.00 out of the award made to Plaintiff, but not in addition thereto.

Judgment in the case will be entered in conformity with the foregoing.