Kenneth **PETERSON**, Appellant,

v.

**UNITED STATES of America**, Appellee.

No. 81–1507.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 14, 1981.

Decided March 23, 1982.

Rehearing Denied May 17, 1982.

John Hjellum, Hjellum, Weiss, Nerison, Jukkala & Wright, Jamestown, N.D., for appellant.

James R. Britton, U. S. Atty., Lynn E. Crooks, Asst. U. S. Atty., Fargo, N.D., for appellee.

Before BRIGHT, Circuit Judge, GIBSON, Senior Circuit Judge, and LARSON, Senior District Judge.*

FLOYD R. GIBSON, Senior Circuit Judge.

Kenneth Peterson claims that the United States negligently flew a B–52 bomber at too low an altitude over his farm, frightening his dairy cows while he was milking them. Peterson claims that, as a result, he was physically injured by the frightened cows, that he lost several cows, and that he was eventually forced to sell his dairy herd.

Peterson filed a timely administrative claim which was denied by the United States Air Force. He then filed a complaint in federal district court stating a claim under the Federal Tort Claims Act. After a one-day bench trial, the district court dismissed Peterson's complaint on the grounds that liability under the Federal Tort Claims Act had not been proved.

We have reviewed the record and we find sufficient evidence of negligence to impose liability on the United States. We therefore reverse and remand the judgment of the district court.

## I.

On September 9, 1977, the United States Air Force conducted an Operational Readiness mission, which is an evaluation flight mission which simulates war-time conditions. Fifteen bombers flew the mission, fifteen minutes apart. Each bomber was to fly the same route within an eight-mile-wide corridor at a constant altitude of 550 feet and a speed of 350 miles per hour. The route for the mission was selected by a Strategic Air Command Route Development team. The bombers were to simulate bomb drops at specified target sites.

The Air Force drew from its fleet of B–52 bombers for the mission. The Government concedes that the B–52 is an old, partially obsolete aircraft. It notes in its brief that the individual aircraft have been in service for a long time and that all of the B–52s' major electronic systems are obsolete.

Each bomber was equipped with mapping navigational radar equipment. Each plane was also equipped with two altimeters, a pressure altimeter and a radar altimeter. The radar altimeter functions to judge the plane's height above the ground. The pressure altimeter is calibrated to make barometric readings.

## II.

The Government concedes that at approximately 5:50 p.m. on September 9, 1977, one

---

* The Honorable Earl R. Larson, Senior United States District Judge, District of Minnesota, sitting by designation.

of the B–52 bombers flew over the vicinity of Kenneth Peterson's farm. The Government admits that, at the time, the plane was outside its prescribed flight corridor, which was approximately four miles northwest of the Peterson farm.

At the time, Mr. Peterson, a 49-year-old dairy farmer, was in his barn with his wife and son, all of whom were in the process of milking their sixty dairy cows. The cows were in stanchions. Kenneth Peterson was kneeling between two cows, removing a breaker cup from one of the cows. The B–52 which at that point flew over the farm made a tremendous noise. The cows were frightened. They lunged about and Peterson was momentarily caught between two cows. Peterson claims that each cow placed its weight on him and twisted his back. He claims that at the same time one of the cows stepped on his right foot.

Mr. Peterson's wife and son and, as soon as he was able, Mr. Peterson went outside to see what had caused the noise. They all saw a plane flying at an unusually low altitude, which they have estimated to be 75 feet.

### III.

The crew of the bomber which flew over the Peterson farm had checked the plane's equipment prior to flight and had found it operable. However, early in the bombing run, the mapping navigational radar equipment failed.

Since the object of the mission was to simulate wartime conditions, the crew had been instructed to conduct the flight if there was any chance of getting the "bombs" on target and if it could be done without jeopardizing the safety of the aircraft and crew. When the navigational equipment failed, the crew's captain determined that the safety of the crew and aircraft were not in jeopardy and continued the flight using an alternative form of navigation.

The pilot testified at trial that he believed that he did not fly at an altitude below 550 feet. He also believed, however, that he was in the flight corridor at all times and that he made all of his simulated bomb drops at the designated points. It was later determined that he had hit all but one of his bomb sites accurately.

Within a week of the incident, one of Peterson's pregnant cows died and two cows spontaneously aborted their calves. Approximately two weeks after the incident, Peterson decided to sell his dairy herd, which was in fact sold by mid-October (about a month after the incident).

The district court never reached the issue of damages. It held that "the flight crew of the B–52 bomber used due care in the exercise of their duties, and there was no liability on the part of the United States under the Federal Tort Claims Act."

### IV.

We are aware that we are not to set aside the findings of fact made by the trial court unless we find them clearly erroneous. The question for us to ask, under Rule 52(a) of the Federal Rules of Civil Procedure, is whether, on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *School District No. 54 v. Celotex Corp.*, 556 F.2d 883, 886 (8th Cir. 1977). We are left with such a conviction in this case.

### V.

Peterson sued the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680 (1976). Section 1346(b) grants the federal district courts jurisdiction of tort actions against the United States "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[1] Sec-

---

1. Section 1346(b) provides:

Subject to the provisions of chapter 171 of this title, the district courts, together with the

tion 2674 makes the United States liable, with certain exceptions, for the negligence of its employees "in the same manner and to the same extent as a private individual under like circumstances ...."[2] "[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." *Rayonier, Inc. v. United States*, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957).

█ Exceptions to the provisions of the Federal Tort Claims Act are set out at 28 U.S.C. § 2680. One such exception, contained in subsection (a), is known as the discretionary function exception. It exempts from the provisions of the Act any claim based on the exercise of a discretionary function or duty by a Government employee.[3] The planning level of the Air Force training and evaluation missions, which would include the development of the route for the mission at issue here, is protected within this discretionary function exception. *See Maynard v. United States*, 430 F.2d 1264 (9th Cir. 1970) (decision to con-

duct training flights in supersonic airplanes and selection of routes to be taken are acts protected by discretionary function exception). Nevertheless, the discretionary function exception does not protect the United States from liability for operational negligence in carrying out such a mission. *See, e.g., Dalehite v. United States*, 346 U.S. 15, 42, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953); *Ward v. United States*, 471 F.2d 667 (3d Cir. 1973). The United States is not protected if the pilot operating the B–52 which flew over Peterson's farm was negligent in implementing the policy decisions made by Government officials.

### VI.

The law in North Dakota provides that an aircraft may not fly over the lands of the state at such a low altitude as to interfere with the use to which the land is put.[4] It also provides that liability should be imposed for all injuries which are caused by the flight of an aircraft, to persons or property on the lands of the state.[5] In addition, Federal Aviation Administration regulations provide for minimum safe altitudes for aircraft as follows:

United States District Court for the District of the Canal Zone, and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

2. Section 2674 provides, in relevant part:
 The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

3. Section 2680 provides:
 The provisions of this chapter and section 1346(b) of this title shall not apply to—
 (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute

or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

4. N.D.Cent.Code § 2–03–04 provides in part:
 Lawfulness of flight.—Flight in aircraft over the lands and waters of this state is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or water beneath....

5. N.D.Cent.Code § 2–03–05 provides in part:
 Damage to persons and property.—The owner and the pilot, or either of them, of every aircraft which is operated over the lands or waters of this state shall be liable for injuries to persons or property on the land or water beneath caused by the ascent, descent, or flight of the aircraft, ... in accordance with the rules of law applicable to torts in this state, ....

§ 91.79 Minimum safe altitudes; general.

Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:

. . . .

(c) Over other than congested areas. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In that case, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

Applying the law of North Dakota to the facts of this case, we believe a finding of liability on the part of the United States is compelled. In the words of the North Dakota statute, the flight of the B–52 did "interfere with the then existing use to which [Peterson's] land . . . [was] put . . . ." Under North Dakota law and the Federal Tort Claims Act, the United States is liable for injuries to persons and property on the land over which it flew, just as a private individual would be responsible for similar negligence.

Although the district court never reached the issue of damages, it did accept the Petersons' story that the B–52 frightened their cows and caused the cows to lunge about in their stanchions. The court also concluded that Mr. Peterson was momentarily caught between two cows and that he fell into a cement manure gutter. The court found that within a week of the flight, a pregnant cow died and two cows spontaneously aborted their calves.

In addition, the eyewitness testimony indicates that the B–52 was flying at an altitude of less than 550 feet when it flew over Peterson's farm. The pilot of the aircraft testified about the day in question as follows: "I do not remember that specific day." Transcript of Proceedings, at 15. And later he testified: "I remember the flight as such but all the specifics, no, sir, I do not." Transcript of Proceedings, at 51.

The pilot testified that the height of the B–52 during the mission was established and maintained by use of a radar altimeter. The crew would set a "clearance plane setting" on the radar altimeter and any time the plane dropped below that setting a light would flash. If the plane remained above the level of the setting, the light would not flash. On the day in question, the radar altimeter did presumably function properly throughout the flight. The pilot testified that, though he could not remember the specifics of the flight, he did know that whenever the radar altimeter flashed, he would climb in the plane until the flashing stopped. When asked if at any point during the flight he fell below 550 feet, the pilot answered, "Not that I know of." Transcript of Proceedings at 26.

The pilot, however, also testified that "[i]t's standard course for [the radar altimeter] to flash" during a flight. Transcript of Proceedings at 49. He said that it normally flashed during the mission because the crew was trying to fly right at 550 feet so they tried "to keep it right there where it just barely flashes." *Id.*, at 50. However, when the light is flashing, one cannot tell how far below 550 feet the plane is flying. In addition, Mr. Peterson testified that as the B–52 approached his farm it could have flown over a river valley about three and one-half miles away from the farm. As the plane climbed out of the valley, over the Petersons' farm, it could have been well below 550 feet. Thus, taken as a whole, the pilot's testimony that he did not fly below 550 feet is, at best, equivocal.

On the other hand, four eyewitnesses testified that the plane was flying well below 550 feet. Kenneth Peterson, his wife, and his son each testified that the plane was flying at approximately 75 feet. A fourth witness, a neighbor of the Petersons', testified that he saw the plane flying at about 300 to 400 feet. These witnesses, although they may have been mistaken about the exact height of the plane, do remember the specific day and time in question. And although the Petersons' credibility may be questioned to some extent because of their interest in the outcome, the neighbor's testimony serves as proof of the pilot's negligence, especially because the neighbor had seen B–52s flying the route before and he

knew the level at which the planes should be flying.

The plaintiff thus produced credible evidence that the plane flew below acceptable limits and established a prima facie case of liability. The Government's evidence failed in rebuttal. Thus, the trial court's ultimate finding of no negligence is not supported by the record and must be deemed clearly erroneous. Accordingly, we reverse and remand, directing that the district court find the Government negligent and determine plaintiff's damages.

