**Ahmet AKETEPE, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 94–946–Civ–J–20.

United States District Court,
M.D. Florida,
Jacksonville Division.

Jan. 2, 1996.

G.J. Rod Sullivan, Jr., Sullivan & Boyd, Jacksonville, FL, Paul H. Due, Kirk A. Guidry, Due, Caballero, Price & Guidry, Baton Rouge, LA, Lewis O. Unglesby, Unglesby & Koch, Baton Rouge, LA, for plaintiffs Ahmet Aketepe, Celal Kilinc, Sevket Yuruk, Hasan Zorlu.

Ralph Lee, U.S. Attorney's Office, Middle District of Florida, Jacksonville, FL, David V. Hutchinson, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, for defendant U.S.

## *ORDER*

SCHLESINGER, District Judge.

Before the Court are the following motions:

(1) Defendant's Motion for Summary Judgment (Doc. No. 37, filed September 22, 1995);

(2) Plaintiffs' Motion for Summary Judgment on Liability (Doc. No. 39, filed September 25, 1995);

(3) Defendant's Motion to Strike Witnesses' Affidavit (Doc. No. 43, filed October 13, 1995).

■■■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has discharged its burden, the nonmoving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

■■■ In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the nonmovant, *Key West Harbour v. City of Key West*, 987 F.2d 723, 726 (11th Cir.1993), and resolve all reasonable doubts in that party's favor, *Spence v. Zimmerman*, 873 F.2d 256, 257 (11th Cir.1989). The nonmovant need not be given the benefit of every inference, but only of every "reasonable" inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir.1988).

The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

■■■ Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir.1988). It must be emphasized that the mere existence of *some* alleged factual dispute will not defeat an otherwise properly supported summary judgement motion. Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2511–12.

In the case at hand, the parties filed a Joint Pretrial Stipulation which contained a "Statement of Agreed Facts" (Doc. No. 45, filed October 27, 1995). Thus, no genuine issues of material fact remain to be resolved and this case is ripe for summary judgment as a matter of law.

## FACTS

From September 25, 1992, through October 8, 1992, the navies of several North Atlantic Treaty Organization ("NATO") countries, including Turkey and the United States of America, were involved in the combined forces naval exercise, "Exercise Display Determination 1992" ("DD–92"). Admiral J.M. Boorda, United States Navy, Commander in Chief, Allied Forces Southern Europe, was the Commander in charge of all NATO forces participating in DD–92.

For the exercise to simulate wartime encounters between opposing powers, the participants were divided into two opposing forces, the Brown forces and the Green forces. Turkish and American warships, as well as those of other NATO countries, were assigned to both the Brown forces and the Green forces. Vice Admiral T. Joseph Lopez, USN, was in command of the Brown forces. Admiral Kroon, Netherlands, was in charge of the Green forces. The U.S. Navy aircraft carrier USS SARATOGA (CV–60) ("Saratoga") was assigned to the Brown forces; the Turkish Destroyer TCG MUAVENET (DM 357) ("Muavenet") was assigned to the Green forces.

For the "enhanced tactical" or battle problem phase of DD–92, the Brown forces were to attempt an amphibious landing at Saros Bay, Turkey, while the Green forces were to stop and destroy the Brown forces. Admiral Boorda's orders were for the units comprising the Brown and Green forces to actively seek and destroy each other. Both task force commanders had full authority to engage the enemy when and where they judged appropriate using all warfare assets to achieve victory. Of course, all attacks were supposed to be simulated attacks.

On October 2, 1992, during the enhanced tactical phase [of DD–92] the Saratoga fired two live Sea Sparrow missiles at the Muavenet. Both of said missiles physically impacted, in whole or in part, the Muavenet. The missile launch was not the result of any willful, intentional or deliberate misconduct. The missile launch was not the result of any equipment or system failure.

The lack of uniform terminology, i.e., the imprecise use of terminology, used by Saratoga personnel involved in the missile firing, caused a misunderstanding which occasioned the actual firing of the missiles. The failure to communicate clearly and in standard terminology was caused by the lack of a Navy standardized training and qualification process for Tactical Action Officers (TAO) and Ship's Weapons Coordinators (SWC) on board the Saratoga. The missile launch occurred during a drill aboard the Saratoga in which the Sea Sparrow system was to be utilized to simulate attacks on nearby ships participating in the ongoing NATO exercise.

Rear Admiral Dur, the Battle Group Commander and the Composite Warfare Commander for the Brown forces embarked on the Saratoga during DD–92. He approved the Saratoga's Combat Direction Center Officer's (CDCO) plan to conduct the simulated missile firing drill approximately 25 minutes before it was to occur. The actual procedures for conducting a simulated attack are always the responsibility of the Commanding Officer of each vessel. Thus, the missile firing was internal to the Saratoga.

The enlisted Sea Sparrow team aboard the Saratoga did not have advance notice of this drill prior to the time they were awakened on the evening of October 1, 1992, to conduct the drill. Certain Saratoga personnel involved in the missile firing were not affirmatively made aware that the exercise was a drill, a simulation, not an actual event. The officers running the drill failed to understand the significance of terms and requests made by the Missile Fire Control System operator which included communications that the missile crew was preparing for an actual live missile launch. There were no Navy standard procedures and regulations in existence at the time of the missile firing applicable to the drill which resulted in the missile launches. For example, they were not required to repeat announcements of "THIS IS A DRILL" or similar words.

The live missile launches could have been prevented if a key watch stander, the Target Acquisition System operator, had been briefed that only a simulation exercise launch was intended. The live missile launches

could have been prevented if watch standers within the combat Direction Center (CDC) had known the meaning of certain terms being used by the fire Control Operator which indicated he intended to conduct a live firing. The Target Acquisition System (TAS) operator did not confirm with any officer in the Combat Direction Center (CDC) his belief that a live firing was intended. Saratoga TAS console operators understood the term "arm and tune" to require the actual arming of the missiles in preparation for a real firing. Neither the TAO nor the SWC appreciated the significance of this terminology. The term "arm and tune" was used once by the TAS operator in the drill during which the live missiles were launched on October 1, 1992.

This case was filed on behalf of members of the crew of the Muavenet, and their survivors, who allegedly suffered injuries and/or loss of property and/or death as a result of the accidental destruction of part of that vessel by the two live Sea Sparrow missiles which were fired from the Saratoga during DD–92. In their Complaint Plaintiffs allege that their damages were caused by the following acts of negligence:

1. The negligent absence of adequate communication among personnel associated with the operation of the Sea Sparrow System;

2. The negligent last minute decision by SARATOGA Operational Watch Officers to conduct an ad hoc drill using Sea Sparrow System to simulate attacks on nearby ships participating in the ongoing NATO exercise;

3. The Watch Officers' negligent decision to awaken the enlisted Sea Sparrow team to participate in the no-notice drill;

4. The negligent failure to advise the oncoming missile system's operators that what was contemplated was a drill, a simulation, and not an actual event;

5. The negligent failure of the officers running the drill to understand the significance of terms and requests made by the missile fire control system operator which indicated that the missile crew was preparing for an actual missile launch; and

6. Other incidents of negligence to be shown at the trial hereof.

Plaintiffs' Complaint at ¶ 9.

On April 11, 1995, Defendant filed a Motion to Dismiss which argued that this case should be dismissed because the claims were barred by the *Feres* doctrine. *See Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). This Court denied that motion because Defendant failed to show, at that time, that the underlying rationales of *Feres* militated against allowing this action to proceed. *See Elliott By and Through Elliott v. United States,* 13 F.3d 1555, 1560 (11th Cir.1994).[1] After filing a motion for reconsideration (Doc. No. 30), which this Court denied (Doc. No. 35), Defendant filed the motion for summary judgement (Doc. No. 37) which is currently pending before the Court.

## SUMMARY OF THE ARGUMENTS

In its Motion for Summary Judgment, Defendant argues that this case presents a political question which can not be resolved by the Court. According to Defendant, the issues raised by Plaintiff would necessarily require the Court to invade the province of the executive and legislative branches because the Court would be forced to review the training procedures utilized by the Navy during DD–92 in order to impose liability on Defendant. Defendant contends that this case is really a friendly-fire case involving

---

**1.** These policy justifications include: (1) the "distinctly federal" relationship between the United States and its military personnel; (2) the presence of an alternative source of compensation; and (3) the fear of disrupting the military disciplinary structure. *See Stencel Aero Eng. Corp. v. United States,* 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2058–59, 52 L.Ed.2d 665 (1977). Defendant's motion was denied because it failed to show that Plaintiffs were under the supervision of an American superior—a fact which the par-

ties now stipulate—and it failed to show that there was an alternative source of compensation available to Plaintiffs. Because this Court has determined that the issues raised by Plaintiffs' complaint raised political questions which are nonjusticiable, the application of the *Feres* doctrine need not be reexamined, although it is likely that this case would be dismissed on that basis in light of the additional information which has been provided since Defendant's motion to dismiss was denied.

only military personnel rather than a case in which civilians were harmed by members of the military.

Plaintiffs contend that this case does not present a political question, but instead is a simple negligence action in which the Court need only determine whether the lapse in communication which occurred on the Saratoga constituted culpable negligence. According to Plaintiffs, this suit is akin to a suit by civilians to recover for damages which they incur as a result of actions by the military, and such suits have been ruled justiciable. *See Koohi v. United States,* 976 F.2d 1328 (9th Cir.1992) *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993) (holding that the accidental shooting down of an Iranian airbus by the U.S.S. VINCENNES presented a justiciable controversy); *Peterson v. United States,* 673 F.2d 237 (8th Cir.1982) (holding that damages resulting from a sonic boom produced by a low-flying military aircraft presented a justiciable controversy); and *Ward v. United States,* 471 F.2d 667 (3d Cir.1973) (same). Thus, Plaintiffs contend, the Court should not dismiss this action.

## DISCUSSION

■ In *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), the United States Supreme Court delineated six factors which it considered indicative of political questions:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

[2] a lack of judicially discoverable and manageable standards for resolving it; or

[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

[4] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or

[5] an unusual need for unquestioning adherence to a political question already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*See also United States v. Munoz–Flores,* 495 U.S. 385, 389–90, 110 S.Ct. 1964, 1967–68, 109 L.Ed.2d 384 (1990).

■ Generally, all cases involving foreign affairs potentially raise nonjusticiable political questions. *See, e.g. Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1917) (stating that "[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision"). Likewise, military training is an area generally outside the scope judicial review. *See Gilligan v. Morgan,* 413 U.S. 1, 8, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1972). However, as was noted in *Baker v. Carr,* 369 U.S. at 211, 82 S.Ct. at 707, it would be "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." The determination of whether a case raises a political question depends upon "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.*

■ Thus, when deciding whether a political question is involved, a court must closely examine the particular issues presented in the case. *Id.* The Court must carefully consider the extent to which this case involves basic policy decisions entrusted solely to the executive in discharge of its Constitutional role. Executive action that only indirectly gives content to some foreign policy issue is not outside the scope of review. Judicial review is only prohibited "[i]n the narrow band of governmental action where foreign policy interests are direct and substantial." *Spacil v. Crowe,* 489 F.2d 614, 619 (5th Cir.1974). Therefore, "[i]ssues which are not at base sweeping challenges to the Executive's foreign policy typically are adjudicated by the courts because they do not

involve judicial usurpation of the Executive's constitutional powers to manage foreign affairs." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1512 (D.C.Cir.1984) (en banc) *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).

As was noted by Plaintiffs, the federal courts have previously allowed damages actions in which the negligence of the armed forces is alleged to be the cause of personal injury, death, and/or the destruction of personal property. *See Koohi v. United States,* 976 F.2d at 1331; *Peterson v. United States,* 673 F.2d 237 (8th Cir.1982); *Ward v. United States,* 471 F.2d 667 (3d Cir.1973). Furthermore, when the Plaintiffs are only seeking money damages, the courts have been willing to permit such cases to go forward. *See Scheuer v. Rhodes,* 416 U.S. 232, 247–49, 94 S.Ct. 1683, 1692–93, 40 L.Ed.2d 90 (1974) (permitting a suit against the National Guard for its activities relating to the Kent State shootings to proceed). However, the courts have never confronted the issue of whether the courts can consider an action for damages filed by participants in joint military training operations who are injured as a result of the actions of other participants, or so called friendly-fire incidents.[2]

In an effort to invoke the protection of *Koohi, Peterson,* and *Ward,* Plaintiffs attempt to classify themselves as civilians rather than as members of the armed services. Plaintiffs' characterization is, however, less than accurate. The Plaintiffs in this case were members of the Turkish Navy who, as an incident of their service, participated in military exercises in which they were under the supervision of an American supervisor, Admiral J.M. Boorda. Thus, although the Plaintiffs here were actually part of another country's armed forces, they should be treated as though they were serving within the Executive Branch for the purpose of determining whether the Court should refrain from deciding this case. *See Daberkow v. United States,* 581 F.2d 785, 788 (9th Cir. 1978) (holding that "[t]he relationship between a foreign soldier engaged in joint military activities and his American superiors is similar to the relationship of an American soldier to an American superior; military discipline could be disrupted just as much by a foreign serviceman's lawsuit as by an American's").[3] Because any decision by the Court in this case would necessarily invade the province of Executive and Legislative Branches, it is clear that the Court should refrain from reviewing the incident in question.[4]

As support for this Court's decision to refrain from deciding the issues presented by this case, one need look no further than Plaintiffs' Complaint and the parties' stipulation of fact. In Plaintiffs' Complaint, Plaintiffs allege that Defendant was negligent in failing to communicate that the attack was to be a simulation, failing to use or understand

---

**2.** As can be expected, most friendly fire cases are disposed of because of the application of the *Feres* doctrine. The case at bar is unique in that it does not involve injury to American service members. However, the principle behind *Feres,* that a service member should be precluded from suing the government for injuries suffered as a result of actions by a fellow service member, should apply with equal force in this case.

**3.** In *Daberkow,* the Court applied the *Feres* doctrine and dismissed the case. Although *Feres* would provide this Court with an alternative basis for dismissing this case in light of the *ex gratia* payments made by the United States and the existence of an alternative source of compensation—those benefits described in Exhibit B to Defendant's Motion for Summary Judgment (Doc. No. 38)—the Court need not address that basis for dismissal. The fact that this type of lawsuit would disrupt the relationship between a soldier and his or her superiors, would require

this Court to dictate how training exercises were to be conducted and would require this Court to undermine the Executive Branch's attempts to settle this case through diplomatic means is sufficient to justify this Court's decision.

**4.** *See also Bentzlin v. Hughes Aircraft Co.,* 833 F.Supp. 1486 (C.D.Cal.1993), stating that "civilians injured at the hands of the military do not raise political questions; soldiers injured at the hands of the military raise political questions. The relationship between soldiers and the military is indubitably within the province of the Executive. Indeed, the Supreme Court has recognized that '[t]he complex subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.' *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973)".

particular terms and by forcing the enlisted Sea Sparrow team to participate in an early morning, no-notice drill. In the joint stipulation, the parties agree that the Sea Sparrow missiles were launched as a result of lapse in communications between those who knew the attack on the Muavenet was to be a simulation and those who did not know, but who had the ability to control the use of live ammunition. In essence, Plaintiffs' claims can be summarized as follows: Nobody told the Saratoga missile crew that the attack was to be drill rather than actual combat. *See* Plaintiffs' Response (Doc. No. 42). The question remains, however, whether those persons should have known it was a drill.

In matters such as military training and exercises, it is best that the Court refrain from imposing its views of what is reasonable on the Executive and Legislative branches. Simply put, the Court is not qualified to make the determination of whether it was reasonable for the Navy to act in the manner in which it did, because the Court can not determine what level of information would be required to render the drill safe while at the same time retaining its usefulness as an accurate reflection of the Navy's preparedness for battle. Those persons in the other branches are better suited to make the determination of who should know that an exercise is a drill because they are better suited to determine whether drill conditions adequately reflect the actual events.

Additionally, Defendant has attempted through diplomatic means to compensate Plaintiffs for their losses by making *ex gratia* payments to the Turkish government. Permitting this suit to proceed would frustrate the Executive Branch's attempts to resolve this case in a manner which is satisfactory to both the Executive and the Turkish government, because the Court would be forced to determine what reasonable compensation would be rather than permitting the two governments to reach a mutually agreeable settlement.

■ Accordingly, the Court will refrain from deciding this case because the training of the armed forces has been committed to the care of the Executive Branch, no judicially discoverable and manageable standards

exist for resolving the issue of whether the Government's actions were reasonable in this case, the decision would require the Court to make a policy determination regarding the proper method of preparing sailors for battle situations, and would require this Court to settle a dispute which would better be resolved through diplomatic means. Defendant's Motion for Summary Judgment (Doc. No. 37) is **GRANTED**. Plaintiffs' Motion for Summary Judgment (Doc. No. 39) is **DENIED**. Defendant's Motion to Strike Witnesses (Doc. No. 43) is **MOOT**.

The Clerk shall enter judgment in favor of Defendant and against Plaintiffs and shall close the file.

**DONE AND ORDERED.**