Frank WHITLEY, Geraldine Whitley, as Parents of Michael M. Whitley, Deceased, Frank Whitley, as Administrator of the Estate of Michael W. Whitley, Deceased, Plaintiffs-Appellees, Cross-Appellants.

v.

UNITED STATES of America, Defendant-Appellant, Cross-Appellee.

No. 97-8886.

United States Court of Appeals,

Eleventh Circuit.

March 26, 1999.

Appeals from the United States District Court for the Northern District of Georgia. (Nos. 3:94-CV-64-JTC, 3:94-CV-74-JTC), Jack T. Camp, Judge.

Before ANDERSON and BIRCH, Circuit Judges, and PAINE[*], Senior District Judge.

BIRCH, Circuit Judge:

This appeal requires us to determine whether *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), precludes recovery under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, to the parents and estate of a foreign serviceman, who died in a motor vehicle accident while in the United States for a recreational event because of the negligence of an American military service member. Following a nonjury trial, the district judge determined that *Feres* did not prevent recovery under the FTCA. Because we have determined that the circumstances under which the accident occurred were not incident to military service, we affirm.

## I. BACKGROUND

The 1993 United States Military National Championship Rugby Tournament ("Tournament") was played at Fort Benning, Georgia, a United States Army ("Army") reservation, for the purpose of determining the best rugby teams in the United States military. The Columbus-Fort Benning Rugby Football Club ("Columbus-Fort Benning Club"), a private rugby organization, hosted the Tournament to raise funds for the club. To generate interest in the Tournament, the Columbus-Fort Benning Club invited the Duke of

[*]Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

Wellington's Regimental Rugby Team ("DWRRT") to play an exhibition match against all-stars from the collective military teams participating in the Tournament as well as matches with civilian teams to prepare for the exhibition match. The DWRRT was not to compete in the military Tournament.

Lieutenant Colonel David Santa-Olalla, battalion commander of the Duke of Wellington's Regiment ("DWR"), accepted the invitation for the DWRRT because he thought that a break from active duty and a foreign tour would reward the rugby players' commitment to their team. The trip was not officially sanctioned or approved by the British Army.[1] The DWR considered the United States trip for its rugby team to be for a recreational rather than a military purpose.

Participation in the trip to the United States by the DWRRT was voluntary for those rugby players who desired to participate.[2] When an insufficient number of DWRRT members volunteered, the Halifax Rugby Club, a private British rugby club, was invited to participate. Consequently, two members of the DWRRT for the tour only were civilian rugby players from the Halifax Rugby Club. The trip was financed from private sources: the players contributed one-third; the team raised one-third; and the Regimental Council[3] contributed one-third from non-military funds.

Lieutenant Colonel Santa-Olalla requested assistance from the Columbus-Fort Benning Club in transporting the DWRRT players. The Columbus-Fort Benning Club responded that it could not provide

[1]The organization and function of a British regiment, such as the DWR, is different from active military units in the United States Army. A regiment consists of an active battalion and a reserve battalion, similar to American National Guard units. A regiment also includes cadets and retired regiment members who do not serve in the British Army. Additionally, a British regiment performs non-military functions that are social and recreational.

[2]In contrast to a military exercise, Lieutenant Colonel Santa-Olalla testified that participation in the rugby tour was voluntary and that the DWRRT members could choose whether or not they wanted to go. *See* R9-72-73. Regarding his participation in the DWRRT tour to the United States, Captain Bruce Faithfull testified: "It was for volunteers. You had to pay your way to go over there. It wasn't an Army-organized thing." *Id.* at 118. Another teammate, Captain John Mayo, testified: "I volunteered." *Id.* at 150.

[3]The Regimental Council is comprised of military and non-military individuals; it is not part of the British Army command structure. The Regimental Council maintains a fund for civic activities, for the assistance of veterans, and for the support of activities of the members of the regiment.

transportation. Lieutenant Colonel Santa-Olalla then contacted the Fort Benning British Liaison Officer, Lieutenant Colonel Black, concerning transportation arrangements for the DWRRT players.

Through Lieutenant Colonel Black's efforts, two minivans were leased from a local rental agency to transport the DWRRT.[4] Army regulations, however, required that Army personnel drive the vans and prevented members of the DWRRT from driving them. Accordingly, Lieutenant Colonel Black went through the proper military channels to obtain drivers. With the approval and support of the Battalion Commander, Lieutenant Colonel Leon, Lieutenant Colonel Black acquired three Army enlisted men to drive the vans: Specialists, Curry, Patrick, and Kanney.[5] These enlisted men were advised that they were to drive the British rugby team wherever it needed to go and not to drink and drive. Specifically, Specialist Kanney's commanding officer testified that he "briefed [Kanney] on his responsibility and my expectations of his conduct; and I also issued a lawful order not to drive and drink."[6] R13-597.

The Army drivers remained on duty status as opposed to leave while they were assigned to provide transportation to the DWRRT. Nevertheless, they were excused from attending the formations of their units while they were driving the British rugby team. The drivers decided among themselves who would drive which van.[7] They were not instructed regarding the chain of command of the rugby players or told that they were attached to a British unit. The drivers did not know the ranks of the military members of the DWRRT because the rugby players traveled in civilian clothes and referred to each other by first names.

---

[4]Morale, Welfare and Recreation funds were used to provide transportation for the DWRRT. It was not a condition of this funding that the money be used for military visitors. These funds had been used to provide transportation for such visiting groups as the Boy Scouts.

[5]Specialists Curry and Patrick volunteered for the driver duty, while Specialist Kanney was ordered by his commanding officer to be a driver.

[6]Similarly, Specialist Kanney's First Sergeant testified that he told him to drink "nothing more" than a soft drink and to "follow orders" and to "be disciplined." R13-641.

[7]The Army drivers acted in an analogous capacity to taxi drivers. They took instructions from the DWRRT players concerning where to go and when to be there. Nevertheless, the drivers did not consider that the British team had the authority to tell them how to drive. For example, when DWRRT members told Specialist Curry that he was driving too slowly, he ignored them. *See* R12-491.

3

On April 26, 1993, the DWRRT arrived at the Atlanta Airport. The Army drivers, accompanied by Lieutenant Colonel Black, another British officer stationed at Fort Benning, and the civilian president of the Columbus-Fort Benning Club met the British rugby team at the airport. Lieutenant Colonel Black briefed the DWRRT at the airport. He explained that Fort Benning had provided the vans and drivers. He also cautioned that the vans were leased by the Army and that members of the British rugby team could not drive them. After instructing the military drivers, Lieutenant Colonel Black told the DWRRT to take care of the drivers. The British rugby players considered this instruction to be a request to feed the Army drivers and to make them feel comfortable with the DWRRT.

The DWRRT players instructed the Army drivers when to take them to a destination but gave the drivers no other instructions concerning their duties. On April 28, 1993, the British rugby team told the Army drivers to drive them from Fort Benning to Atlanta to play a rugby match against the Atlanta High Country Rugby Team, a private, civilian team. Other than the three Army drivers, no Americans accompanied the DWRRT to Atlanta to play this rugby match.

Following a British victory, the Army drivers took the DWRRT to the Grandstand Bar in Atlanta, where the High Country Rugby Team had provided a buffet dinner and beer for the British players. Socializing after playing a rugby match is an inherent part of the event for rugby teams and clubs; it is known as "the third half." R5-60-11. Major Mark Lodge, the DWRRT team manager and senior officer in charge of necessary arrangements, decided that one van would leave Atlanta for the return trip to Fort Benning at 11:00 P.M., and that the other van would remain and return later with DWRRT members who wanted to stay longer in Atlanta for further socializing. The Army drivers decided that Specialist Curry, accompanied by Specialist Patrick, would drive the van that departed at 11:00 P.M.[8] Specialist Kanney agreed to drive the later van, scheduled to depart at 4:00 A.M.

---

[8]Given his late night with the DWRRT players the previous night, affording four hours of sleep, and his knowledge of the long return trip from Atlanta to Fort Benning, Specialist Curry did not want to drive the van departing at 4:00 A.M. because he "was scared that [he] would fall asleep." R12-485.

4

Specialists Curry and Patrick remained in the vans, rested, and had nothing to drink while the DWRRT players were in the Grandstand Bar. Nevertheless, following the 11:00 P.M. departure, Specialist Curry testified that he "was dozing off," would not have stayed awake, and could have had an accident were it not for Specialist Patrick's "tapping" him and "telling [him] to stay up." R12-492. In contrast, Specialist Kanney joined the DWRRT at the bar. On at least one occasion, a British player gave Specialist Kanney a beer. Additionally, a number of the British rugby players saw Specialist Kanney drinking beer at the bar.

When Captain Faithfull of the DWRRT noticed Specialist Kanney drinking beer, he questioned his ability to drive back to Fort Benning at 4:00 A.M. Specialist Kanney responded that he would be alright. A British corporal also questioned Specialist Kanney's drinking and asked if he realized that he was driving them back. Specialist Kanney said that he was having only one beer. One of the civilian members of the DWRRT, Jason Tozer, observed Specialist Kanney drinking a beer at 10:00 or 10:30 P.M. There is no evidence that Tozer or decedent, Lieutenant Michael Whitley, saw Specialist Kanney after 11:00 P.M. Specialist Kanney did not appear to be intoxicated when Specialist Curry talked with him prior to the 11:00 P.M. departure of the first van.

At 4:00 A.M. on the morning of April 29, 1993, Specialist Kanney was instructed to get the second van for the return trip to Fort Benning. He drove the van to the bar, and the remaining members of the DWRRT boarded. Specialist Kanney's demeanor or his speech did not indicate that he was intoxicated, although he admitted consuming a quantity of beer during the course of the evening.[9]

All of the members of the DWRRT had consumed large quantities of alcohol; they immediately fell asleep as the van left Atlanta for Fort Benning. As he departed from Atlanta, Specialist Kanney lost his way.

---

[9]Although civilian DWRRT member Tozer considered himself unfit to drive by 4:00 A.M. because of the beer that he consumed during the course of the night and the demanding schedule, he did not think that Specialist Kanney's having a beer before 10:30 P.M. would affect his ability to drive the van at 4:00 A.M. Tozer considered the Army drivers to be similar to the coach drivers for his rugby team in England: while the driver often would have a beer at the bar during the course of the evening, it was the driver's responsibility to maintain his ability to drive the coach when the rugby team was ready for transport. *See* R10-188.

5

He stopped at a convenience store to ask directions and walked past a Georgia State Trooper as he went into the store to obtain directions. Apparently, he was able to walk well enough that the trooper did not suspect that Specialist Kanney was intoxicated.

While driving south on Interstate 85 in Coweta County, outside of Newnan, Georgia, Specialist Kanney also fell asleep. When the van veered from the shoulder on the left of the highway, Specialist Kanney awoke and suddenly turned the van back onto the highway, which caused it to go out of control. The van slid sideways across the highway; one of the tires blew; the van rolled over and came to rest at the tree line. Lieutenant Whitley partially was thrown out one of the rear windows of the van. Hanging head down, he had a severe cut on his head. Lieutenant Whitley was pronounced dead at the scene; the cause of death was a depressed skull fracture.[10] It is undisputed that Specialist Kanney was acting within the scope of his duties when the accident occurred.

Lieutenant Whitley's parents, plaintiffs-appellees Frank and Geraldine Whitley, and Frank Whitley, administrator of Lieutenant Whitley's estate, sued the government under the FTCA and argued that his death was proximately caused by a United States soldier who negligently drove a van provided by the Army to transport the British rugby team to and from a civilian rugby match. Prior to trial, the district judge granted the plaintiffs' motion under O.C.G.A. § 40-8-76.1(d) to exclude evidence relating to Lieutenant Whitley's failure to wear a seat belt. Following a five-day bench trial, the district judge subsequently entered findings of fact and conclusions of law and awarded judgment to plaintiffs in the amount of $1,200,000 for the wrongful death of Lieutenant Whitley.[11] After this judgment, plaintiffs-appellees moved to amend the

---

[10]DWRRT civilian member Tozer's ear was almost severed from his head in the collision, and his hand was badly cut by broken glass. He received emergency medical treatment at the scene as well as treatment at a local hospital.

[11]Civilian Tozer, whose case was tried with Lieutenant Whitley's case in district court, sought damages under the FTCA for his physical injuries, which included permanent disfigurement and scarring; mental pain and suffering; and medical expenses that he alleged that he sustained as a proximate result of the government's negligence. The district judge awarded him $80,000 in general damages and $9,400 in special damages, the amount of his medical expenses. Upon learning from the government that the Solicitor General had not authorized the appeal of his damages award, Tozer moved to dismiss the appeal

6

judgment because they alleged that the district judge had erred in failing to use the Georgia mandatory five percent discount rate, O.C.G.A. § 51-12-13, in calculating the present value for Lieutenant Whitley's future earnings. Following a hearing, the district judge denied this motion on reconsideration.

On appeal, the government argues that *Feres* precludes recovery by Lieutenant Whitley's parents and estate for his death under the FTCA. The government also contends that the district judge erred in ruling that the government could not introduce evidence that Lieutenant Whitley failed to wear his seat belt on the issue of comparative negligence for the purpose of reducing plaintiffs-appellees' recovery of damages for his wrongful death. In their cross appeal, plaintiffs-cross appellants assert that the district judge erred in denying their post-trial motion wherein they argued that the Georgia mandatory five percent discount rate was not used to calculate the present value of Lieutenant Whitley's future earnings.

## II. ANALYSIS

A.    *Applicability of* Feres

To decide whether *Feres* applies in this case to preclude recovery by the parents and estate of a foreign serviceman who died in the United States because of the negligence of an Army driver, we have direction from the Supreme Court's development of the *Feres* doctrine as it relates to the FTCA and consider the interpretation of our circuit cases. The FTCA permits a limited waiver of sovereign immunity that enables the government to be subject to tort liability as a private person would be in similar circumstances.[12] The measure of recovery is the amount allowed by state law for the plaintiff's claim if the plaintiff were suing the

---

of his case in this court. The government joined his motion, and we dismissed his appeal.

[12]The FTCA provides that federal district courts

> shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).

7

United States as a private person. *See* 28 U.S.C. § 2674. While the FTCA exempts recovery for military injuries or death resulting from combat service, *see* 28 U.S.C. § 2680(j),[13] liability of the government under the FTCA for peacetime injuries to military members was a void that the Supreme Court filled with *Feres* and its progeny, *see Pierce v. United States,* 813 F.2d 349, 351 (11th Cir.1987) (per curiam). The *Feres* Court acknowledged that courts must determine "whether any claim is recognizable in law." *Feres,* 340 U.S. at 141, 71 S.Ct. at 157. "We review both questions of law and a district court's application of law to the facts *de novo.*"[14] *Reich v. Davis,* 50 F.3d 962, 964 (11th Cir.1995).

1.      Feres *Doctrine*

The Court delineated the *Feres* doctrine, which creates an exception to FTCA recovery when a service member is injured or killed incident to military service, in a trilogy of cases, *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954). *See Parker v. United States,* 611 F.2d 1007, 1009 (5th Cir.1980). Analysis of these core cases is instructive for review of subsequent Supreme Court cases applying the *Feres* doctrine and in deciding this case because the "Court has never deviated from [its] characterization of the *Feres* bar. Nor has Congress changed this standard in the ... years since it was articulated.... Instead, the *Feres* doctrine has been applied consistently to bar all suits on behalf of service members against the Government based upon service-related injuries," and the Court has declined to modify it. *United States v. Johnson,* 481 U.S. 681, 686, 687-88, 107 S.Ct. 2063, 2066-67, 95 L.Ed.2d 648 (1987).

---

[13]The FTCA provides government immunity from lawsuits by members of the armed forces for "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j).

[14]We review the district judge's findings of fact for clear error and conclusions of law *de novo. See Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir.1998) (per curiam). Based on our review of the record, we find no clear error in the district judge's factual findings, which are substantiated by the trial testimony. Therefore, our analysis focuses on the legal issues, which we review *de novo.*

Prior to *Feres,* the Supreme Court determined that recovery was available under the FTCA for injuries *unrelated* to military service sustained by members of the United States armed forces. *See Brooks,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200. *Brooks* involved a vehicle accident on a public highway when a father and his two servicemen sons were struck by an Army truck, driven by a civilian employee. One of the sons died; the father[15] and other son suffered severe injuries.

In contrast, *Feres* concerned three consolidated cases wherein the decedents and plaintiff were in active duty on a military base when the negligent government acts that resulted in their deaths or injuries occurred.[16] In distinguishing *Brooks,* the *Feres* Court noted a "vital distinction": "The injury to Brooks did not arise out of or in the course of military duty. Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission." *Feres,* 340 U.S. at 146, 71 S.Ct. at 159. Based on this distinction, the Court held "that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.*

The Court subsequently applied *Brooks* rather than *Feres* to permit FTCA recovery to a veteran for injury caused during a knee operation at a Veterans Administration hospital, although the original knee injury occurred during active duty and resulted in honorable discharge. *See Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139. The Court provided the principal underlying rationale for its holding in *Feres:*

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read [the FTCA] as excluding claims of that character.

*Id.* at 112, 75 S.Ct. at 143; *see United States v. Shearer,* 473 U.S. 52, 57, 105 S.Ct. 3039, 3042, 87 L.Ed.2d 38 (1985) (" 'In the last analysis, *Feres* seems best explained by [the military discipline rationale.]' " (citation

---

[15]In *Brooks,* the civilian father recovered independently under the FTCA, and the government did not contest his recovery. *See Brooks,* 337 U.S. at 50 n. 1, 69 S.Ct. at 919 n. 1.

[16]Feres was killed in a fire in his barracks that was alleged to be the result of "a defective heating plant" and the failure "to maintain an adequate fire watch." *Feres,* 340 U.S. at 137, 71 S.Ct. at 155. The other two consolidated cases involved medical malpractice that occurred at Army hospitals. *See id.*

9

omitted)).[17] Nevertheless, the Court affirmed recovery under the FTCA, "[s]ince the negligent act giving rise to the injury in [*Brown* ] was *not incident to the military service.*" *Brown,* 348 U.S. at 113, 75 S.Ct. at 144 (emphasis added).

The Court has reiterated that interfering with military discipline is the concern at "the heart of the *Feres* doctrine." *Johnson,* 481 U.S. at 692, 107 S.Ct. at 2069; *see United States v. Stanley,* 483 U.S. 669, 702, 107 S.Ct. 3054, 3074, 97 L.Ed.2d 550 (1987) ("[T]he concern for the instinctive obedience of soldiers to orders[ ] is of central importance in the *Feres* doctrine."). "[N]o military organization can function without strict discipline and regulation that would be unacceptable in a civilian setting." *Chappell v. Wallace,* 462 U.S. 296, 300, 103 S.Ct. 2362, 2365, 76 L.Ed.2d 586 (1983). Indeed, "[t]he special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel—would be undermined by a judicially created remedy exposing officers to personal

---

[17]In addition to the concern for military discipline, the *Feres* Court provided two other rationales for the *Feres* doctrine: the " 'distinctively federal' " relationship between the United States and members of its armed forces, *Feres,* 340 U.S. at 143, 71 S.Ct. at 158 (citation omitted), and the availability of a military disability and death compensation source, *id.* at 144-45, 71 S.Ct. at 158-59. The distinctly federal relationship rationale was derived from the concern for having the government's liability depend on the "fortuity of where the soldier happened to be stationed at the time of the injury." *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 671, 97 S.Ct. 2054, 2058, 52 L.Ed.2d 665 (1977). The alternative compensation source was premised on a statutory scheme that provides coverage to injured military personnel irrespective of negligence by the government as a substitute for tort liability. *See Feres,* 340 U.S. at 144-45, 71 S.Ct. at 158-59; *cf. Brooks,* 337 U.S. at 53, 69 S.Ct. at 920 (acknowledging that the Veterans Benefit Act is not an exclusive compensation system, which does not preclude a service member's recovery under the FTCA). Nevertheless, the Court subsequently stated that these two rationales are "no longer controlling." *Shearer,* 473 U.S. at 58 n. 4, 105 S.Ct. at 3043 n. 4; *see Johnson,* 481 U.S. at 696-97, 107 S.Ct. at 2072 (Scalia, J., dissenting) (concluding that the federal relationship rationale "is not a plausible estimation of congressional intent, much less a justification for importing that estimation, unwritten, into the statute"); *id.* at 698, 107 S.Ct. at 2073 (Scalia, J., dissenting) (noting that " 'the presence of an alternative compensation system [neither] explains [n]or justifies the *Feres* doctrine; it only makes the effect of the doctrine more palatable' " (citation omitted) (alterations in original)). The *Parker* court also recognized that these two rationales provide no help in determining when an injury to a service member is incident to service. *See Parker,* 611 F.2d at 1012. Therefore, we will not address these two rationales further except to acknowledge that the existence of a British compensation system does not preclude FTCA recovery for Lieutenant Whitley's parents and estate any more than auxiliary military benefits barred FTCA compensation in *Brooks, Parker,* and *Pierce. See Johnson,* 481 U.S. at 697-98, 107 S.Ct. at 2073 (Scalia, J., dissenting). Furthermore, such alternative benefits may be inadequate to compensate for debilitating injuries or death.

liability at the hands of those they are charged to command." *Id.* at 304, 103 S.Ct. at 2367. Thus, the *Feres* doctrine addresses the Court's concern as to "whether [an FTCA] suit requires the civilian court to second-guess military decisions" and "whether the suit might impair essential military discipline."[18] *Shearer,* 473 U.S. at 57, 105 S.Ct. at 3043. Furthermore, the Court has cautioned that plaintiffs cannot escape the *Feres* doctrine and focus by a claim of negligence when, in actuality, "a decision of command" is involved. *Id.* at 59, 105 S.Ct. at 3043.

The Court has advised that "[t]he *Feres* doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases." *Id.* at 57, 105 S.Ct. at 3043. At the outset of our analysis, we note that permitting recovery under the FTCA by Lieutenant Whitley's parents and estate will not impinge on military discipline, the primary concern of the *Feres* doctrine. Lieutenant Whitley was not acting under orders from the British military, of which he was a member, and he was in guest status with respect to the Army. Additionally, the Court has distinguished the negligence of the driver in *Brooks,* where FTCA recovery was allowed, from negligence in military decisions,

---

[18]Explaining that FTCA awards should not impinge on military discipline, the Second Circuit stated:

> It is difficult to see how FTCA damage awards can, except in the rarest of cases, interfere with a disciplinary relationship between the government and the military tortfeasor. The issue in these cases is typically not whether the military is permitted to do certain things. It is, instead, whether a member of the armed services has behaved negligently or otherwise wrongfully. If that employee committed a tort—did something that if done by a civilian would give rise to liability—and the act was in the scope of government employment, the government is *prima facie* liable unless something about the injured plaintiff—like military ties—bars liability. If the government is liable the government is held to pay damages. But paying damages does not mean that the military is told by a court that it must do things differently, or even that it must take steps to control its employees.
>
> Injunctions and regulations tell people what they must do and what they must not do, and it is *these* types of intrusions that would entangle courts in military affairs. Tort judgments do neither of these things.... [U]nder the FTCA, courts simply hold that [fault-based] harms done by military employees of the government are compensable costs of the military enterprise.

*Taber v. Maine,* 67 F.3d 1029, 1047-48 (2d Cir.1995).

which implicates military discipline. This case involves the off-base negligence of the Army driver and, consequently, is apposite to *Brooks* rather than *Feres.* As the trial and appeal in this case have shown, "the alleged negligence is not of the sort that would harm the [Army] disciplinary system if litigated." *Pierce,* 813 F.2d at 354. The claim by Lieutenant Whitley's parents and estate that Specialist Kanney negligently caused a single-vehicle accident on a public highway while driving a British rugby team, composed of DWR and civilian members, from a civilian rugby match does not implicate military discipline, challenge military orders, or intrude upon the relationship of any service member with superior officers. Thus, the "dire consequences" that the government envisions are unfounded on the facts of this case. *Brooks,* 337 U.S. at 52, 69 S.Ct. at 920.

2.      *Circuit Interpretation and Application of the* Feres *Doctrine*

The former Fifth Circuit differentiated between the rationales or policy considerations that the Court used to justify the *Feres* doctrine and its application to decide the "incident to service" line of demarcation for compensation determination under the FTCA. *See Parker,* 611 F.2d at 1010-15. More analysis than "a purely causal" relationship with the military is required; that is, "one cannot merely state that but for the individual's military service, the injury would not have occurred." *Id.* at 1011; *see Brooks,* 337 U.S. at 52, 69 S.Ct. at 920 (recognizing that "all human events depend upon what has already transpired"). Derived from *Parker,* our court uses a three-part test, which considers (1) duty status, (2) location, and (3) activity, to determine whether a service member's injuries resulting from government negligence are compensable under the FTCA because they are incident to service. *See Pierce,* 813 F.2d at 353-54; *Parker,* 611 F.2d at 1013-15. After evaluating the totality of these factual circumstances, we decide whether the injury in question was incident to service. *See Pierce,* 813 F.2d at 353; *Parker,* 611 F.2d at 1013.

a. Duty Status

Critical to the Court's determination that the injuries to the three servicemen in *Feres* were incident to service was their active duty status. The Court specified that "[t]he common fact underlying the three cases

12

is that each claimant, *while on active duty and not on furlough,* sustained injury due to negligence of others in the armed forces." *Feres,* 340 U.S. at 138, 71 S.Ct. at 155 (emphasis added). Our court has recognized that "the serviceman's duty status was the most important criterion in determining whether an injury was incident to military service." *Jimenez v. United States,* 158 F.3d 1228, 1229 (11th Cir.1998) (per curiam).

While a service member "who is on active duty and on duty for the day is acting 'incident to service,' " a member of the armed forces "on furlough or leave, as in *Brooks,* normally has an FTCA action."[19] *Parker,* 611 F.2d at 1013. The service member in *Parker* had requested and received permission to be absent from his normal duty hours for four days and five nights for the purpose of moving his family to another residence away from the military reservation. At the inception of this leave, as Parker was returning home after his normal duty hours and still on the military reservation, another serviceman driving a military vehicle negligently collided head-on with Parker, who died from the injuries that he sustained. In reversing the district court's determination that Parker was acting incident to service at the time of his accident, the court permitted the FTCA action because it concluded that Parker's "*exercised* right to be absent for four days was actually more like a furlough than mere release from the day's duties." *Id.* at 1014 (emphasis added). The court rejected the active duty distinction based on subjectivity to recall advanced by the government by noting the government's admission "that even soldiers on furlough can be recalled, yet those soldiers have an FTCA action if injured." *Id.* at n. 10.

In *Pierce,* the serviceman requested and received permission to leave the military base for the afternoon to take care of personal business. As Pierce was traveling on his motorcycle on a public highway,

---

[19]The *Parker* court distinguished between a "pass," which "is a discretionary time off privilege granted by the supervising officer and not charged against the record," and "furlough" or "leave," which "is generally for a longer period and is charged against the soldier's record." *Parker,* 611 F.2d at 1013 n. 9; *see Zoula v. United States,* 217 F.2d 81, 82 n. 1 (5th Cir.1954) ("The fundamental difference between a pass and a leave or furlough is that a furlough or leave is a right earned and to which the soldier is entitled. A pass is simply a privilege that may or may not be accorded him."). In either status, "the service member can be recalled to work." *Parker,* 611 F.2d at 1013 n. 9. Formal passes are not necessary for "off-duty" service members who are not serving their regular duty hours; they "technically have the same status as [service] members on 'pass.' " *Parker,* 611 F.2d at 1013 n. 9.

a naval recruiter, acting within the scope of his official duties, negligently collided with him and Pierce's injuries caused him to be seventy-percent disabled. Aligning that case with *Brooks* and *Parker,* our court determined that by "exercis[ing] the right to be absent from regular duty, the serviceman attains a status much akin to being on furlough," which enables the service member on a pass to maintain an FTCA action. *Pierce,* 813 F.2d at 353; *see Parker,* 611 F.2d at 1013 (distinguishing the claimants in *Zoula v. United States,* 217 F.2d 81, 82-83 (5th Cir.1954), "who had merely the *unexercised* right to a pass" (emphasis added)).

Pursuant to the authorization of his commanding officer, Lieutenant Whitley was off-duty during the extended time that he was in the United States to participate in the DWRRT tour.[20] Lieutenant Colonel Santa-Olalla considered the rugby tour a reward or recreation for the DWRRT members who wanted to participate in it. Lieutenant Whitley and his teammates voluntarily had requested and received authorization to be absent from their regular duty status and to travel to the United States to play in various rugby matches.[21] The DWRRT players did not wear their uniforms or dog tags, and they did not refer to one another by military rank.[22] They financed their tour, including trip insurance, with non-military funds, traveled to the

---

[20]We distinguish Lieutenant Whitley's off-duty status for the rugby tour in the United States from off-duty time experienced daily by all service members where *Feres* precludes negligence claims. *See Flowers v. United States,* 764 F.2d 759 (11th Cir.1985) (off-duty serviceman returning from a grocery store sustained injuries in automobile accident resulting from the negligence of a military bus driver); *Mason v. United States,* 568 F.2d 1135 (5th Cir.1978) (per curiam) (off-duty serviceman attending to personal business on his way home was injured in accident when his motorcycle was struck by a car negligently driven by a serviceman). As the *Parker* court explained, this sort of off-duty status, where service members are not acting during their regular service hours and need not report for duty until the next day, does not require formal passes or special permission to be off-duty. *See Parker,* 611 F.2d at 1013 n. 9. This clearly is different off-duty status from the special authorization granted by Lieutenant Colonel Santa-Olalla to Lieutenant Whitley and the DWRRT players to travel to the United States for the duration of the rugby tour.

[21]Lieutenant Colonel Santa-Olalla authorized the DWRRT to be absent from their normal duty while on the rugby tour. Lieutenant Whitley and the other servicemen members of the DWRRT were not acting pursuant to military orders while on the trip, *see* R9-72 (testimony of Lieutenant Colonel Santa-Olalla); *id.* at 118, 121 (testimony of Captain Faithfull); *id.* at 150 (testimony of Captain Mayo); they were "off-duty," *id.* at 108 (testimony of Lieutenant Colonel Santa-Olalla); R10-249 (testimony of Captain Knight).

[22]The servicemen members of the DWRRT did not wear "dog tags" or uniforms. R9-120 (testimony of Captain Faithfull); R10-248 (testimony of Captain Knight). They did not refer to one another using

14

United States on a civilian airplane, and paid for their own lodgings.[23] Given these factual indicia, we

conclude that Lieutenant Whitley's off-duty status relative to his British regiment was analogous to furlough

as in *Brooks.*

## b. Location

"[T]he situs of the injury is an important factor in determining whether the activity is 'incident to

service,' " *Pierce,* 813 F.2d at 353, "especially with vehicular collisions," *Parker,* 611 F.2d at 1013. "If the

soldier is on furlough and off the military reservation, *Brooks* teaches that an action lies under the FTCA."

*Id.* at 1014. Even a service member's returning to a military base but outside the premises line permits an

FTCA action.[24] *See id.; Pierce,* 813 F.2d at 353 n. 6 (allowing FTCA recovery, although injured serviceman

---

military rank; instead, they used each other's first names. *Id.* at 248 (testimony of Captain Knight).

[23]The DWRRT traveled to the United States on a civilian airliner. *See* R10-183 (testimony of Tozer). Non-military or private funds, instead of British military or government funds, financed the insurance coverage for the trip. *See* R8-75, 76 (testimony of Lieutenant Colonel Santa-Olalla). The DWRRT players paid for their own lodging at Fort Benning. *See* R10-185 (testimony of Tozer).

[24]The location factor does not stand alone and is considered in conjunction with the service member's activity at the time of injury. *See Parker,* 611 F.2d at 1014. Indeed, we have allowed FTCA recovery although injuries to a service member occurred on a military reservation. *See id.* at 1013-15; *see also Elliott ex rel. Elliott v. United States,* 877 F.Supp. 1569, 1576 (M.D.Ga.1992), *aff'd by an equally divided en banc court,* 37 F.3d 617, 618 (11th Cir.1994) (per curiam) (permitting FTCA action where off-duty serviceman watching television in his military housing on base suffered permanent, debilitating injuries from carbon monoxide poisoning because the Army had failed to maintain the hot-water-heater-venting system as required under Georgia landlord law). Nevertheless, such cases are inapposite to this case, where the injuries unquestionably occurred away from a military reservation.

> To the extent that the government attempts to transform the van in which Lieutenant Whitley and his British rugby teammates were riding when the accident occurred into a military vehicle similar to a military aircraft carrier or transport plane, we are unpersuaded. *See, e.g., Potts v. United States,* 723 F.2d 20 (6th Cir.1983) (per curiam) (determining that *Feres* barred a FTCA action by a serviceman who was injured returning in a naval landing craft to his duty station on a naval research vessel); *Uptegrove v. United States,* 600 F.2d 1248 (9th Cir.1979) (concluding that *Feres* precluded FTCA action by surviving wife and children because serviceman was killed while riding in an Air Force transport plane as a military, space-available passenger). We see an obvious and significant distinction between a van commercially leased by the Army to transport the DWRRT to various rugby matches, specifically a civilian match, and a military vessel or plane that is clearly incident to service. Moreover, in this circuit, location means on or off a military base under *Pierce* and *Parker.*

15

on a pass was "approximately 500 feet from the boundary of the military reservation" when the motor vehicular accident occurred).

It is undisputed that the fatal accident for Lieutenant Whitley occurred on Interstate 85, a public highway in Coweta County, outside Newnan, Georgia. This site is many miles from Fort Benning where the DWRRT was staying while in the United States. With respect to location, this case is analogous to *Brooks* and *Pierce,* where the injuries to the service members occurred off a military base and were not considered to be incident to service.

c. Activity

We finally must consider the activity in which Lieutenant Whitley was engaged when he was killed. In distinguishing *Brooks,* the *Feres* Court determined that a service member injured on leave is "not analogous to that of a soldier injured *while performing duties under orders*." *Feres,* 340 U.S. at 146, 71 S.Ct. at 159 (emphasis added); *see Zoula,* 217 F.2d at 82 n. 1 ("A person on a furlough or leave is not subject to military duty, although he may actually spend the time provided in the furlough or the leave on a military reservation."). Significant to the *Parker* court's conclusion that the serviceman was not acting incident to service when he was injured was that he "was not directly subject to military control; he was not under the compulsion of military orders; he was not performing any military mission." *Parker,* 611 F.2d at 1014. In *Pierce,* we recognized that "to construe any conceivable personal activity as 'incident to service' because that activity happened to be performed by a member of the armed forces" would preclude service members from bringing FTCA actions "merely by virtue of the fact that the claimants are wearing a United States uniform." *Pierce,* 813 F.2d at 354. By contrast, we determined regarding the death of a United States Navy Airman Recruit while participating in sea rescue training that "[d]espite the extreme circumstances surrounding [his] death, we cannot escape the fact his death arose out of an activity incident to his military service." *Kitowski v. United States,* 931 F.2d 1526, 1530 (11th Cir.1991).

16

At the time of his fatal accident, Lieutenant Whitley was traveling with his DWR rugby teammates, including civilians, from Atlanta where the British team had played a rugby match and socialized with a civilian team. Neither Lieutenant Whitley nor any DWRRT member was subject to the supervision or command of the Army.[25] The rugby tour for the DWRRT members was not organized by the British Army in any way; the commanding officer of the DWR merely gave the rugby players who wanted to participate permission to be absent from their regular duties for the duration of the rugby tour. Participation in the rugby tour was purely voluntary for both the DWR and civilian team members.

Specifically, Lieutenant Whitley was *asleep* when he sustained lethal injuries in the single-vehicle accident caused by the negligence of Specialist Kanney. Unlike the *Feres* serviceman who died while asleep when his base barracks burned, clearly incident to his service or he would not have been there,[26] Lieutenant Whitley and the other DWR members as well as civilian rugby teammates were in the United States to participate in the rugby tour by choice, and he had authorization from his commanding officer to be absent from his regular duties. In this furlough-like status, Lieutenant Whitley's situation was distinct from that of the *Kitowski* serviceman, who was actively participating in a military exercise when he died.[27]

Additionally, cases dealing with recreational activities made available to service members on a military reservation because they are serving in the armed forces are inapposite. Like sleeping, participating

---

[25]To the extent that the DWRRT was under military control during the time that the rugby team was in the United States, it would have been the British military. Captain Mayo, a DWRRT member, nevertheless testified: "I wouldn't classify it as a military mission, no. It was a rugby tour." R9-152. Furthermore, British team member Captain Knight testified that he did not consider the exhibition rugby match to be a joint military venture with the Americans. *See* R10-248. The DWRRT service members were not subject to United States Army command or attached to the Army. The sole obligation of the DWRRT players regarding the United States Army was to follow the rules of military courtesy and to conduct themselves as guests of the Army.

[26]"Servicemen have to live somewhere." *Pierce,* 813 F.2d at 354. Moreover, being asleep in a serviceman's military-provided housing is clearly incomparable to being asleep on a commercially leased van that was being used for transportation from a civilian event.

[27]Protocols generally associated with military operations were not used during the time in the United States. Lieutenant Colonel Santa-Olalla testified that the rugby tour did not have an "exercise name." R9-77.

17

in recreational activities is part of the daily lives of service members living on a military base. The former Fifth Circuit affirmed the district court and expressly adopted its reasoning in a case where an Army staff sergeant riding his motorcycle from a military softball practice was killed in a collision with a post shuttle bus. *See Watkins v. United States,* 462 F.Supp. 980 (S.D.Ga.1977), *aff'd,* 587 F.2d 279 (5th Cir.1979) (per curiam). Determining that *Feres* barred FTCA recovery, the court reasoned that the serviceman's active duty status,[28] the location of the accident on the military base, and the fact that he was leaving a military softball team practice made *Feres* dispositive.[29] *See id.* at 988.

In contrast, the *Watkins* court observed "that an 'off-duty' serviceman who is injured off-base in a traffic accident totally unrelated to his military service should now receive the benefits of the *Brooks* rationale." *Id. Pierce* exemplifies this reasoning. Similarly, the court applied *Brooks* to allow an FTCA action when a serviceman on a twenty-four-hour pass was traveling from his off-base residence to an off-base bird hunt and his vehicle collided with a negligently driven Army vehicle. *See Hand v. United States,* 260 F.Supp. 38 (M.D.Ga.1966). Holding that a pass is equivalent to a furlough with respect to military duties, the court explained: "There is no difference in the freedom which the man enjoys. In both instances the man is *relieved from military duty during the period specified.*" *Id.* at 41 (emphasis added).

Particularly significant to this case are cases where FTCA actions have been permitted based on *Brooks* because the service members were not taking advantage of a military privilege or status during their

[28]" 'Active duty,' " defined by the *Watkins* court, meant "not on leave or furlough, in the contemplation of *Feres* itself and its progeny." *Watkins,* 462 F.Supp. at 987. The court further explained that passes to leave the base generally are limited as to duration and distance. *Id.* at 987. This distinction comports with our analogy of Lieutenant Whitley's authorized time to be absent from his regular duties for the rugby tour. Furthermore, because of the time change and overseas travel, plainly this time was not the same as daily off-duty status after responsibilities during official hours have been served.

[29]Similarly, other circuits have concluded that recreational activities on a military reservation necessarily involve privileges that accrue to service members incident to their military service and, thus, *Feres* precluded FTCA actions. *See, e.g., Millang v. United States,* 817 F.2d 533 (9th Cir.1987) (per curiam) (serviceman severely injured in vehicular accident during military picnic on base); *Hass v. United States,* 518 F.2d 1138 (4th Cir.1975) (serviceman injured riding horse at military owned and operated stable); *Chambers v. United States,* 357 F.2d 224 (8th Cir.1966) (serviceman drowned in swimming pool on military base).

18

leave or off-duty time; instead, they were engaging in civilian activities on a par with civilians. The service member in *Pierce,* for example, had used his afternoon leave to accomplish personal errands and to eat lunch off base; the accident that resulted in his injuries occurred as he was returning to base from these activities. Other circuits have decided cases similarly.[30] Common to the respective courts' decisions in these cases was the determination that the service members were not acting pursuant to military orders or any differently than civilians when they were injured or killed. Consequently, the courts concluded that the service members were not acting incident to service at the time of their injuries or death and, therefore, permitted FTCA actions.

In this case, Lieutenant Whitley was asleep and a passenger returning from a rugby match in Atlanta with his DWR teammates, when he was fatally injured in the single-vehicle accident. Civilians were members of the British rugby team, which shows that this was a sport rather than a military exercise. The rugby match that the DWRRT had played was with a civilian rugby club in Atlanta. Lieutenant Whitley was not on a military mission or acting under military orders at the time of his death. Thus, at the time of the fatal accident for Lieutenant Whitley, there was no military purpose to this particular rugby match and the concomitant transportation to and from Atlanta for it.[31] We conclude that the civilian rugby match in which

---

[30]*See, e.g., Dreier v. United States,* 106 F.3d 844, 853 (9th Cir.1997) (regarding the drowning death of an off-duty service member, the court recognized that "as an individual drinking beer and swimming during his leisure time in an area to which the public has access, [the service member] was in the same position as any civilian would have been at the time of the government's negligence"); *Taber,* 67 F.3d at 1051 (concerning the severe injuries sustained by service member driving a civilian's car on weekend leave in car accident off base with another service member, the Second Circuit determined that "[t]here is nothing characteristically military" in a service member's "spend[ing] a romantic weekend with a companion"); *Kelly v. Panama Canal Comm'n,* 26 F.3d 597, 600 (5th Cir.1994) (regarding death of off-duty Army officer who was killed when the mast of a catamaran that he was sailing struck hanging electrical wire, the court noted that "the Commission has not shown that [the officer] was directly subject to military control. Rather, [the officer] was engaged in the purely recreational activity of sailing a catamaran rented from a civilian-run marina").

[31]We are unimpressed by the government's argument that the rugby tour for the British team served the military purpose of building goodwill between allied military forces. The United States and Britain have fought admirably as allies in two world wars in this century and otherwise enjoy an amicable and cooperative relationship. Even if this were the purpose, and we are not persuaded that it was, that purpose was not being served regarding the civilian rugby match in Atlanta, which was the occasion that ultimately resulted in Lieutenant Whitley's death and is our focus in this case. *Cf.* R9-72 (Lieutenant Colonel Santa-Olalla testified that the rugby tour was not a joint venture with the Americans); R10-248

19

Lieutenant Whitley had participated and the socializing afterward were solely recreational and in no way connected to any military mission of either the British or American armed forces. Consequently, neither the recreational activities in which Lieutenant Whitley had been involved prior to his fatal injuries nor his sleep at the time of his death were incident to his military service.

### d. Totality of Circumstances

Having analyzed each of the three factors that our circuit uses to determine whether the activity in which a service member was engaged at the time of injury was incident to service, we must consider the totality of these circumstances. *See Pierce,* 813 F.2d at 353; *Parker,* 611 F.2d at 1013. First, Lieutenant Whitley was in a furlough-like or authorized off-duty status. He was under no military orders for the duration of the rugby tour in the United States. He had volunteered for the trip and received permission to go from his commanding officer. He primarily financed his participation in the rugby tour, and he observed no military protocol during the tour, such as being addressed by his rank. Thus, his authorized absence from duty was analogous to furlough in *Brooks,* particularly given the duration and distance of the trip. *See Hand,* 260 F.Supp. at 41-42 ("We, therefore, attach no significance to the fact that in the *Brooks* case the man was on what is known as 'furlough' and in this case the Plaintiff was on what is known as a 'pass', and conclude that the fact that the man was on a pass instead of a furlough would not tend to make a quail hunt 'an activity incident to (his) military service.' " (alteration in original)).

Second, the single-vehicle accident that resulted in Lieutenant Whitley's death occurred on a public highway far from the Fort Benning military reservation where he was staying with his rugby teammates while in the United States. Third, Lieutenant Whitley was asleep when he died and a passenger in a commercially leased van. There was nothing about the preceding rugby match and socialization with a civilian team or the travel involved with playing the rugby match that made it a military exercise. Considering these factors cumulatively, we conclude that Lieutenant Whitley was not engaged in an activity incident to service at the

(same testimony from Captain Knight, DWRRT member).

20

time of his death.  *See Brooks,* 337 U.S. at 52, 69 S.Ct. at 920 (determining that the injuries sustained by the servicemen brothers in the automobile accident with another serviceman had "nothing to do with the Brooks' army careers").  Accordingly, *Feres* does not prevent the FTCA actions by Lieutenant Whitley's parents and estate in this case.

3.        *Application of* Feres *to Foreign Soldiers*

        This case requires an additional step in the *Feres* analysis because it involves a foreign service member.  *Feres* and its progeny involve United States service members.  Since recovery is sought by or on behalf of the foreign service member under the FTCA, a United States law, and money damages from the United States government, the same *Feres* analysis that applies to American service members is appropriate for foreign service members who claim injury or death resulting from the negligence of United States armed forces.  Otherwise, there would be two standards of FTCA recovery, American and foreign, which would impair military discipline, the principal *Feres* concern.  "[M]ilitary discipline could be disrupted just as much by a foreign serviceman's law suit as by an American's;  and liability for negligent orders would be equally detrimental whether the serviceman asserting a claim is a member of the United States or a foreign military." *Daberkow v. United States,* 581 F.2d 785, 788 (9th Cir.1978);  *see In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 762, 780 (E.D.N.Y.1980) ("[T]o rule that the United States government has waived sovereign immunity with respect to the tort claims of foreign servicemen but not with respect to the claims of American servicemen would distort the underlying purposes of the FTCA, defy common sense, and almost certainly be contrary to the intent of an elected Congress."), *reconsideration in part on other grounds,* 580 F.Supp. 1242 (E.D.N.Y.1984).

        Like a United States service member, a foreign service member who pursues an FTCA action because of injury or death resulting from the negligence of American armed forces, is adjudicated under the *Feres,* incident-to-service standard.  If the injury to the foreign service member is determined to be incident to service, then FTCA recovery is precluded under *Feres.*  In contrast, if the injury to the foreign service

21

member is not incident to service, then FTCA recovery is permissible under the *Brooks* rationale. As with United States service members pursuing FTCA actions against the American military, such actions must be analyzed on a case by case basis.

While not binding upon us, the few cases involving injuries or death to foreign service members lend support to our conclusion. In *Daberkow,* the United States and the Federal Republic of Germany contracted to provide flight training at Luke Air Force Base in Arizona to German student pilots to produce "approximately 100 combat capable" pilots a year.[32] *Daberkow,* 581 F.2d at 786. Attempting to follow the instructions of a United States Air Force pilot in another plane, a German officer assigned to the German squadron on a solo training flight crashed and was killed. Denying the FTCA action by the German officer's wife and son, the Ninth Circuit concluded that the *Feres* prohibition on "actions brought for injuries to servicemen arising out of activity incident to their service[ ] should apply with equal force in this case, although the serviceman is not a member of the United States military." *Id.* at 788.

*In re "Agent Orange"* concerned *inter alia* claims by Australian veterans that they suffered injuries resulting from their exposure to the herbicidal, defoliating chemical, Agent Orange, used by the United States during the Vietnam war. The Australian veterans "concede[d] that their presence in southeast Asia during the period in question was the direct result of their country's participation in joint military operations with the United States." *Id.* at 780. The court recognized that the factual elements that determine the *Feres* incident-to-service standard include whether the activity in question has a " 'real and substantial relationship' " to the service member's military service, *id.* at 775 (citation omitted), or whether it is " 'inseparably entwined' with, and directly related to, plaintiffs' military service," *id.* at 779 (citation omitted). Applying the incident-to-service standard to the facts in that case, the court determined that *Feres* barred the claims of the Australian veterans.

---

[32]The two governments divided the responsibilities for this flight training program: the German government supplied the aircraft and maintenance; the United States Air Force "provid[ed] base support facilities and instructional training." *Daberkow,* 581 F.2d at 786.

22

In *Aketepe v. United States,* 925 F.Supp. 731 (M.D.Fla.1996), *aff'd,* 105 F.3d 1400 (11th Cir.1997), *cert. denied,* --- U.S. ----, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998), crew members of a Turkish destroyer and their survivors brought a negligence suit against the United States to recover for the injuries and deaths that resulted when live missiles were fired from an American carrier during a naval exercise. The navies of several North Atlantic Treaty Organization ("NATO") countries, including Turkey, were involved in a combined naval exercise "to simulate wartime encounters between opposing powers." *Id.* at 734. A United States Navy admiral was the commander in chief in charge of all the participating NATO forces. During the " 'enhanced tactical' or battle problem phase" of the exercise, forces that included an American aircraft carrier and a Turkish destroyer were "to actively seek and destroy each other" in a simulated attack. *Id.* There was no advance notice to the American naval team of the drill when they were awakened at night to conduct it. Additionally, the personnel involved in the missile firing were unaware that the exercise was a simulation. The naval officers conducting the drill failed to understand the terminology and commands, which resulted in a live missile attack on the Turkish destroyer.[33] Consequently, members of the Turkish crew were injured or killed.

The district judge recognized that "[t]he Plaintiffs in this case were members of the Turkish Navy who, as an *incident of their service,* participated in military exercises in which they were under the supervision of an American supervisor." *Id.* at 737 (emphasis added). Although citing *Daberkow* and noting

---

[33]The district judge found:

> There were no Navy standard procedures and regulations in existence at the time of the missile firing applicable to the drill which resulted in the missile launches. For example, they were not required to repeat announcements of "THIS IS A DRILL" or similar words.
>
> The live missile launches could have been prevented if a key watch stander, the Target Acquisition System operator, had been briefed that only a simulation exercise launch was intended.

*Aketepe,* 925 F.Supp. at 734.

23

that *Feres* would provide an alternative basis for dismissing the case,[34] *see id.* at n. 3, the district judge granted summary judgment to the United States because he determined that the case involved a nonjusticiable political question. Acknowledging the application of *Feres* to friendly fire cases involving American service members, the district judge noted that "the principle behind *Feres,* that a service member should be precluded from suing the government for injuries suffered as a result of actions by a fellow service member, should apply with equal force in this case [involving foreign service members]." *Id.* at 737 n. 2.

The deaths or injuries in *Daberkow, In re "Agent Orange,"* and *Aketepe* occurred to active-duty, foreign service members during combat or combat training. The significance in these cases of the joint military operations under American supervision is to provide a conduit for recovery under the FTCA. Obviously, if the negligence that resulted in the injuries or deaths derived from their own commanders or military supervisors from another country, there would be no cause of action under the FTCA.

The distinction between those cases and this case is readily apparent. The DWRRT, which included civilian players, was in the United States in an off-duty status akin to furlough[35] and principally at their own expense at the invitation of the Columbus-Fort Benning Rugby Club, a civilian organization. This private rugby club had arranged various civilian rugby games for the DWRRT. During the British team's return from a civilian game and socializing in Atlanta, the single-vehicle accident occurred because of the negligence of the Army driver.

In contrast to the joint military exercises or combat in *Daberkow, In re "Agent Orange,"* and *Aketepe,* the connection of the DWRRT with the United States military was attenuated. The DWRRT was not to play

---

[34]The district judge denied the government's motion to dismiss based on *Feres* because of the government's failure to establish the three *Feres* rationales. He noted, however, that "it is likely that this case would be dismissed" under *Feres* in view of additional information showing that the three *Feres* rationales were present. *Id.* at 735 n. 1.

[35]When asked by the government at trial whether the British rugby tour was a military function, a sporting event, or a fun trip, Captain Knight responded: "It was certainly designed to be a fun trip, to help develop our rugby skills, develop our team spirit." R10-247. This is the description of a furlough-like trip rather than a joint military exercise.

in the official military Tournament; instead, the British team was to play one exhibition game with all-stars from the competing military teams. The British team was lodged on the Fort Benning reservation, but they paid for their own accommodations at a hotel there. The Army provided drivers for the commercially leased vans to transport the DWRRT while in the United States, but it extended similar courtesies to other civilian visitors. Plainly, the interaction of the British rugby team with the Army was not so intertwined for a military purpose as to make the circumstances in which Lieutenant Whitley was killed apposite with the cases that have determined that *Feres* barred the claims of foreign service members injured or killed during military exercises with American military members.[36] As the district judge concluded: "The courtesies provided by the American military do not implicate the sorts of concerns that would lead to the application of the *Feres* doctrine.... The Plaintiffs could just as easily have been a foreign *civilian* rugby team afforded the same accommodations." R5-60-29, 30.

We have explained that foreign service members and American service members must be treated alike in applying *Feres* to prevent disruption of military discipline. Previously herein, we analyzed the circumstances of Lieutenant Whitley's death under our circuit, three-part test to determine whether a foreign service member's injury or death is incident to service under *Feres*.[37] *See Pierce,* 813 F.2d at 353-54; *Parker,* 611 F.2d at 1013-15. Accordingly, our conclusion that Lieutenant Whitley's death was not incident to his military service and does not preclude plaintiffs-appellees' FTCA action on the facts of this case is unaffected by the fact that Lieutenant Whitley was a foreign soldier. Significantly, Specialist Kanney's negligence that

[36]Given the joint military mission exercises during which foreign service members were injured or killed in *Daberkow, In re "Agent Orange,"* and *Aketepe,* the government's attempt to align this case on the basis of boosting morale to trigger the *Feres* bar is inapposite and insufficient. The record evidence in this case does not show enough connection with the American military for this to have been the purpose, particularly since the DWRRT played and socialized with more civilian rugby teams than the one military, all-stars match that was not part of the military Tournament.

[37]We recognize that *Daberkow, In re "Agent Orange,"* and *Aketepe* were analyzed under the three rationales used by the Court to justify *Feres.* As we have explained, *supra* note 17, the first two rationales apparently lack current vitality. *See Shearer,* 473 U.S. at 58 n. 4, 105 S.Ct. 3039. Moreover, our analysis is bound by our circuit precedents in *Pierce* and *Parker.*

25

caused a single-vehicle accident on a public highway while driving the British rugby team from a civilian game does not implicate military discipline by challenging military orders or intruding upon the relationship of any service member to superior officers.

B.      *Seat Belt Defense*

As an alternative issue on appeal, the government challenges the district judge's pretrial granting plaintiffs-appellees' motion *in limine* to preclude consideration of the fact that Lieutenant Whitley was not wearing a seat belt at the time of the accident that resulted in his death.  Because Georgia is a comparative negligence state, the government argues that its defense that Lieutenant Whitley failed to wear a seat belt was relevant and should have been used to diminish the damages awarded to his parents and estate.  The district judge determined that O.C.G.A. § 40-8-76.1(d) (1988)[38] precluded seat belt evidence for the purpose of reducing damages.

Federal courts must apply state law as it has been interpreted by the highest court of the state.  *See Wainwright v. Goode,* 464 U.S. 78, 84, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983) (per curiam).  The operative statute, section 40-8-76.1(d), provides in pertinent part:

> *Failure to wear a seat belt* in violation of this Code section shall not be considered evidence of negligence, shall not be considered by the court on any question of liability of any person, corporation, or insurer ..., and *shall not diminish any recovery for damages arising out of the* ownership, maintenance, *occupancy,* or operation of a passenger vehicle.

O.C.G.A. § 40-8-76.1(d) (emphasis added).  We must follow the interpretation by the Georgia Supreme Court of this statute as it relates to the government's seat belt defense in this case.

In a case where the appellant argued that the proximate cause of appellee's injuries was her failure to wear her seat belt, the Georgia Supreme Court held that this evidence properly was excluded under this statute and reasoned as a matter of public policy "that the legislature may ensure that those who cause vehicular collisions are not permitted to escape liability by raising the defense that the injured party was not

---

[38]Although O.C.G.A. § 40-8-76.1(d) has been amended, we use the version, effective September 1, 1988, applicable to the accident that resulted in Lieutenant Whitley's death on April 29, 1993. *See* O.C.G.A. § 40-8-76.1(d) (1988).

wearing a seat belt." *C.W. Matthews Contracting Co. v. Gover,* 263 Ga. 108, 428 S.E.2d 796, 798-99 (1993). The Georgia Supreme Court bolstered its holding by citing a purpose stated in the preamble of O.C.G.A. § 40-8-76.1 by the Georgia legislature for its enacting the statute as being " 'to provide that a failure to use seat safety belts may not be introduced in evidence in *any* civil action. (Emphasis supplied.).' " *Id.* at 799 (quoting 1988 Ga. Laws § 40-8-76.1). For the clear public policy reason stated by the Georgia Supreme Court, we conclude that the district judge correctly did not consider that Lieutenant Whitley was not wearing his seat belt for the purpose of diminishing the damages award to his parents and estate.[39]

C.      *Damages Award*

Lieutenant Whitley's parents contend on cross appeal that the district judge erred by not using the Georgia five percent discount rate in calculating the economic damages for their son's life. We use the clearly erroneous standard to review a damages award under the FTCA. *See Meader ex rel. Long v. United States,* 881 F.2d 1056, 1060 (11th Cir.1989). To reverse the damages award, we must be " 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

Because the United States is liable to the same extent as a private individual in an FTCA case, its liability is determined by the laws of the state where the negligent act or omission occurred. *See* 28 U.S.C.

---

[39]Based on the public policy reason enunciated by the Georgia Supreme Court in *C.W. Matthews Contracting Co.* that tortfeasors may not escape liability for vehicular accidents by a seat belt defense as to the injured party in conjunction with the stated legislative purpose that failure to wear seat belts is precluded as a defense in *any* civil action, we reject the government's arguments urging consideration of the number of passengers and Lieutenant Whitley's not riding in the front seat. These arguments by the government cannot prevail because they would defeat the public policy and legislative purpose for section 40-8-76.1(d). In granting plaintiffs' motion *in limine* to preclude the introduction of seat belt evidence to diminish plaintiffs' damages, the district judge determined that it would be

> as anomalous to draw the line between ten- and eleven-passenger vehicles as it is to draw the line between front and back seat passengers. And I think that the legislative amendment to a certain extent does reflect the intention of the legislature to remove that sort of anomaly from the application of seat belt evidence.

2d Supp. R1-15-16.

27

§ 1346(b); *Molzof v. United States,* 502 U.S. 301, 305, 112 S.Ct. 711, 714, 116 L.Ed.2d 731 (1992). The Georgia wrongful death statute provides recovery for "the full value of the life of the decedent," O.C.G.A. §§ 51-4-2 and -5(a), which consists of two categories of damages:

> (1) those items having a proven monetary value, such as lost potential lifetime earnings, income, or services, reduced to present cash value ... or (2) lost intangible items whose value cannot be precisely quantified, such as a parent's "society, advice, example and counsel [ ]" as determined by the enlightened conscience of the [factfinder].

*Consolidated Freightways Corp. v. Futrell,* 201 Ga.App. 233, 410 S.E.2d 751, 752 (1991) (citations omitted).

Regarding the first damage category, the Georgia Court of Appeals recognized in a wrongful death action by parents for the automobile death of their twenty-three-year-old son that " '[i]n arriving at the value of the life of the decedent "the [factfinder] is not bound to find that lifetime earnings reduced to present value is the full value of the life of the decedent, but such is an *aid only* to the [factfinder] in making such determination." ' " *Miller v. Jenkins,* 201 Ga.App. 825, 412 S.E.2d 555, 556 (1991) (citations omitted) (first alteration in original) (emphasis added); *see Bulloch County Hosp. Auth. v. Fowler,* 124 Ga.App. 242, 183 S.E.2d 586, 590 (1971) (stating the factfinder's determination of gross sum that the decedent would have earned in his lifetime " 'depend[s] upon the facts of the case' " (citation omitted)), *overruled on other grounds, Gilson v. Mitchell,* 131 Ga.App. 321, 205 S.E.2d 421 (1974). The *Miller* court further acknowledged that "[t]he intangible factors which supplement the economic value to comprise the 'full value of the decedent's life' elude precise definition, particularly in situations ... in which the decedent was employed and thus a basis exists for determining the loss." *Miller,* 412 S.E.2d at 556 (citations omitted). Thus, the trial court has considerable latitude in applying these components to the facts of a particular case in determining the full value of a decedent's life. Additionally, Georgia law requires that the calculated economic damages for potential future amounts be reduced to present value at five percent per year. *See* O.C.G.A. § 51-12-13; *Barnes v. Wall,* 201 Ga.App. 228, 411 S.E.2d 270, 271 (1991).

At the time of his death, Lieutenant Whitley was twenty-six years old, healthy, and had a long and productive life expectancy. He neither lived with his parents nor provided financial support to them. He

enjoyed sports and was an accomplished chef. Lieutenant Whitley also had planned to leave the British military and to travel around the world; he had no definite plans for a future career.

Appellees and the government each had an expert economist testify concerning the value of Lieutenant Whitley's life. After considering all of the evidence, the district judge awarded $1,200,000 for the full value of Lieutenant Whitley's life. His parents moved to reconsider this amount and to amend the judgment on the basis that the district judge had not used the Georgia five percent discount rate. Pursuant to a hearing on this motion, the district judge denied it. He explained that he had used the statutory five percent discount rate after arriving at a "fair and reasonable" assessment for the economic value of Lieutenant Whitley's life as well as the intangible factors.[40] R6-72-3. We recognize that the district judge and appellees may weigh the economic and intangible components differently in calculating the damages amount for the full value of Lieutenant Whitley's life.[41] The district judge heard the evidence at trial, conducted a hearing

---

[40]In denying plaintiffs-appellees' motion to amend the judgment, the district judge observed that "Plaintiffs' argument is based on the *assumption* " that he did not use the statutory five percent discount rate in calculating the economic value of Lieutenant Whitley's life. R6-72-2 (emphasis added). He further explained:

> The Court's damages figure for "the full value of life" consists of both the economic value of decedent's life, and also of intangible factors whose value cannot be precisely quantified. The Court did not specify, and was not required to specify, how much of the damages figure resulted from each component....
>
> While recognizing that any dollar figure can only grossly estimate the value of a life, both in terms of economic and intangible components, the Court judged a figure it deemed fair and reasonable. *The discount rate is merely one factor amongst many that the Court considered to arrive at a damages figure.* After reviewing the facts and arguments presented by both Parties, *the Court concludes that an award of $1.2 million is fair and reasonable; any greater award would be excessive.*

*Id.* at 2-3 (emphasis added).

[41]Following the testimony of the respective economic experts, plaintiffs-appellees and the government stipulated to an amount for the economic value of Lieutenant Whitley's life using the statutory five percent discount rate and apparently argue that the district judge should have accepted that monetary figure. Clearly, the district judge, as factfinder, was not bound by the parties' stipulation in evaluating the full value of Lieutenant Whitley's life. Specifically, the judge had the authority and latitude to assess the evidence and to have a different base economic figure to which he applied the statutory five percent discount rate.

on this issue, recognized the application of the statutory five percent discount rate, and he had the latitude under Georgia law to make his own evaluation of the full value of Lieutenant Whitley's life, including assessing the economic and intangible factors. Therefore, we conclude that the district judge's determination of $1,200,000 as a fair and reasonable amount was not clearly erroneous on the facts of this case.

## III. CONCLUSION

In this appeal, the government argues that FTCA recovery by Lieutenant Whitley's parents and estate is precluded by *Feres* because his death while returning from a civilian rugby match was incident to his service. Alternatively, the government contends that its seat-belt defense should have operated to reduce the damages recovery by his parents and estate. On cross appeal, Lieutenant Whitley's parents argue that the district judge erred by not using the statutory discount rate in calculating the damages award for the full value of Lieutenant Whitley's life. For the reasons that we have explained herein, we AFFIRM.